**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

IN RE ANDERS H. KNUDSEN, doing
business as A & C KNUDSEN FARMS,
and CYNTHIA KNUDSEN,

Debtors/Appellants.

No. C07-3011-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING APPEAL OF
BANKRUPTCY COURT'S ORDER
DENYING CONFIRMATION OF
DEBTORS' FIFTH AMENDED AND
SUBSTITUTED PLAN OF
REORGANIZATION**

––––––––––––––––––

**TABLE OF CONTENTS**

*I.* **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
  *A. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
  *B. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    *1.* **The Knudsens' petition in bankruptcy and reorganization
         plan** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    *2.* **The bankruptcy court's denial of plan confirmation** . . . . . . . . 6
    *3.* **The cross-appeals** . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*II.* **LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
  *A. Standard Of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
  *B. Rules For Statutory Interpretation* . . . . . . . . . . . . . . . . . . . . 9
  *C. The Farmers' Issues On Appeal* . . . . . . . . . . . . . . . . . . . . . 12
    *1.* **The statute at issue** . . . . . . . . . . . . . . . . . . . . . . . . . 12
    *2.* **Treatment of taxes on the sale of slaughter hogs** . . . . . . . . . 14
      *a.* **The bankruptcy court's decision** . . . . . . . . . . . . . . . 14
      *b.* **Arguments on appeal** . . . . . . . . . . . . . . . . . . . . . . 15
      *c.* **Analysis** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        *i.* **Interpretation of "any farm asset. . . ."** . . . . . . 21

|  | ii. | Interpretation of "the debtor's farming operation. . . ." | 22 |
|  | iii. | Interpretation of "used in" the debtor's farming operation | 26 |
|  | iv. | Applicability of the statute | 31 |
| 3. | | Allocation of tax claims entitled to beneficial treatment | 32 |
|  | a. | The bankruptcy court's decision | 32 |
|  | b. | Arguments on appeal | 33 |
|  | c. | Analysis | 36 |

D. The IRS's Cross-Appeal ........................................ 40
    1. The pertinent part of the bankruptcy court's ruling ....... 40
    2. The scope of the IRS's cross-appeal .................. 43
    3. Arguments on appeal ............................ 45
    4. Analysis ...................................... 49
        a. Applicability of § 1222(a)(2)(A) to post-petition transactions ................................ 50
        b. Treatment of post-petition taxes as administrative expenses of the bankruptcy estate .............. 54

III. CONCLUSION ........................................ 63

C an family farmers, who liquidated their slaughter hogs to convert their farming operation from a farrow-to-finish hog operation to a custom hog-raising operation, obtain the benefits of an amendment to 11 U.S.C. § 1222(a)(2) under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23, that would allow the taxes generated by the sale of their slaughter hogs to be treated as an unsecured claim against their bankruptcy estate subject to discharge? This and other questions are raised on cross-appeals by the family farmers

and the United States, on behalf of the Internal Revenue Service, from an order of the bankruptcy court denying confirmation of the family farmers' Chapter 12 plan for reorganization. Few—or no—courts have passed on the questions presented here, so that the court finds itself writing on a nearly clean slate, guided by statutory language, legislative history, and bankruptcy policy.

## I. INTRODUCTION

### A. Factual Background

The pertinent facts in this appeal from the bankruptcy court's denial of confirmation of the debtors' Chapter 12 plan are undisputed. Anders Knudsen and Cynthia Knudsen, the debtors and appellants in this bankruptcy case, are husband and wife and the owners of a 160-acre farm in Mitchell County, Iowa, near St. Ansgar, Iowa. The farm includes their 40-acre homestead, which they claim as exempt. Anders has a bachelor's degree in agricultural business with a minor in farm management from Iowa State University. Anders is a farmer and has been engaged in farming since he was a high school student. One component of the Knudsens' farming operation over the years has been a hog operation. In the early 1990s, the Knudsens expanded their hog operation, so that during 1992-1993 their sow herd numbered 250. They also built a farrowing house and started selling feeder pigs. Although the Knudsens initially hired others to fatten their hogs, the Knudsens eventually built two finishing barns, the first in 1995 and the second in 1996. Thus, by 1996, the Knudsens were operating a farrow-to-finish hog operation and were selling their own hogs as their main source of income.

Two occurrences of swine disease in 1999 impaired the growth and profitability of the Knudsens' hog operation. Between 2000 and 2003, both the Knudsens and their lender, St. Ansgar State Bank, became concerned about the financial direction of the

Knudsens' farming operation to the point that the bank became increasingly unwilling to lend money to finance that operation. These circumstances led the Knudsens to investigate a reorganization of their farming operation. To that end, the Knudsens explored the possibility of becoming custom livestock operators. In December 2003, the Knudsens entered into two ten-year contracts to raise hogs for Squealers Pork, Inc. ("SPI"), a Minnesota corporation. Under the terms of the contracts, SPI would provide baby pigs to the Knudsens, which the Knudsens would raise to market weight. Because SPI was concerned about swine disease, SPI required the Knudsens to liquidate completely their own swine herd before they started to raise hogs for SPI. Accordingly, in 2004, the Knudsens sold the last of their breeding sows and all of their slaughter hogs. The Knudsens used the proceeds of the sale of their hogs to make a payment on a loan from St. Ansgar State Bank, which was secured by the hogs. In addition, because of the change in their hog operation, the Knudsens sold a livestock trailer and their interest in some farrowing equipment. The Knudsens also ended their grain farming operations and leased their 160 acres to a friend for cash rent.

In their joint 2004 federal income tax return, the Knudsens reported $525,384 of farm income attributable to the sale of "livestock, produce, grains and other products." This figure included the sale of slaughter hogs. The Knudsens reported net farm income of $65,336 for 2004. The Knudsens reported the sale of their breeding sows as a capital gain of $34,077. Finally, they reported the proceeds of the sale of the farrowing equipment and the livestock trailer as an ordinary gain of $21,659. On their initial 2004 federal tax return, the Knudsens' total tax for 2004 was $19,550.

On June 21, 2005, the Knudsens filed an amended 2004 tax return, which showed the Knudsens' 2004 federal tax to be $55,839. The increase in the Knudsens' 2004 federal tax was due in part to their decision to revoke an election to treat the costs of remodeling

their hog buildings as expenses rather than to depreciate the costs over time.[1] This revocation had the effect of decreasing farm expenses for 2004 and causing a corresponding increase in the Knudsens' income. Shortly after filing their amended 2004 tax return, the Knudsens filed a petition in bankruptcy.

## B. Procedural Background

### 1. The Knudsens' petition in bankruptcy and reorganization plan

The Knudsens filed a bankruptcy petition under Chapter 12 of the Bankruptcy Code on July 1, 2005, seeking bankruptcy protection to reorganize their farming operation. The Knudsens ultimately filed a Fifth Amended and Substituted Plan of Reorganization, which they subsequently modified twice to make "technical" changes. In its Decision Re Plan Confirmation (docket no. 1-37), dated November 20, 2006, the bankruptcy court found that "[t]he essence of the proposed plan is to take advantage of 11 U.S.C. § 1222(a) as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23." *In re Knudsen*, 356 B.R. 480, 483 (Bankr. N.D. 2006). More specifically, the bankruptcy court found that the Knudsens hoped to obtain favorable treatment of the gains on the sale of machinery, equipment, and farmland pursuant to § 1222(a)(2)(A), such that a portion of the income taxes on such gains would be treated as unsecured debt rather than as priority debt to the Internal Revenue Service, and if the Knudsens perform their plan successfully, the unsecured portion of the taxes, including penalties and interest, will be discharged. *Id.* at 483-84. As the bankruptcy court also noted, the "Knudsens contend that the same favorable

[1]The increase in the Knudsens' 2004 federal taxes also included an increase in the Knudsens' self-employment taxes from $9,232 to $15,176.

5

treatment should apply to their prepetition restructuring sales of fat hogs, sows, and equipment." *Id.* at 484.

### 2. The bankruptcy court's denial of plan confirmation

In its Decision Re Plan Confirmation, *In re Knudsen*, 356 B.R. 480 (Bankr. N.D. Iowa 2006), the bankruptcy court addressed seven issues, based on six objections to plan confirmation by the IRS and one objection by the trustee. The bankruptcy court characterized those issues as follows: Issue (1)—tax treatment of the slaughter hogs; Issue (2)—allocation of taxes; Issue (3)—pre-petition taxes and the best interest test; Issue (4)—pre-petition taxes and discharge; Issues (5) and (6)—application of § 1222(a)(2)(A) to post-petition taxes and discharge of post-petition taxes; and Issue (7)—payment of university tuition, which addressed the trustee's sole objection. The bankruptcy court denied confirmation of the Knudsens' Fifth Amended and Substituted Plan of Reorganization after deciding Issues (1), (2), and (7) adversely to the Knudsens. The Knudsens appeal the bankruptcy court's ruling as to Issues (1) and (2), while the United States, on behalf of the Internal Revenue Service (IRS), cross-appeals some or all of the bankruptcy court's ruling on Issues (5) and (6).

### 3. The cross-appeals

The Knudsens filed a Notice Of Appeal (docket no. 1-40) of the bankruptcy court's denial of confirmation of their plan on December 11, 2006, and the IRS filed a Notice of Cross Appeal (docket no. 1-47) on January 10, 2007. Pursuant to a Joint Designation Of Record And Statement Of The Issues (docket no. 15), subsequently filed in this court on April 17, 2007, the Knudsens appeal presents the following two issues:

> [1.] Whether the bankruptcy court erred when it excluded slaughter hogs from the benefit provided by 11 U.S.C. § 1222(a)(2)(A) to any "farm asset used in the debtor's farming operation."

> [2.] Whether the bankruptcy court erred in applying the proration method to determine the amount of tax that qualifies for beneficial treatment under 11 U.S.C. § 1222(a)(2)(A).

As noted above, the IRS initially asserted two issues on cross-appeal, but then, in pre-hearing briefing, restricted its cross-appeal to the following issue, as stated in the Joint Designation Of Record And Statement Of The Issues (docket no. 15):

> [3.] Whether the bankruptcy court erred in attributing income from the postpetition sale of farm assets to the bankruptcy estate and not the debtors.

The court finds, however, that the scope of the IRS's cross-appeal was expanded by the parties in the course of briefing and oral arguments. Therefore, the court will explore the scope of the IRS's cross-appeal when it turns to consideration of that cross-appeal.

Pursuant to a briefing schedule and various modifications, the Knudsens filed their brief on appeal (docket no. 17) on April 20, 2007; the IRS filed its brief (docket no. 24) on May 18, 2007; Prof. Jack F. Williams of the Georgia State University College of Law filed a brief (docket no. 27) as amicus curiae on June 15, 2007; the Knudsens filed a reply brief (docket no. 28) also on June 15, 2007; the IRS served a notice of supplemental authority (docket no. 30) on October 5, 2007, to which the Knudsens filed a reply (docket no. 31) on October 31, 2007; the Knudsens filed a notice of supplemental authority (docket no. 38) on February 28, 2008; and the IRS filed a reply brief concerning its supplemental authority (docket no. 39) on February 28, 2008, completing the pre-hearing briefing.

By order (docket no. 42) dated March 19, 2008, the court set oral arguments on the parties' cross-appeals for May 9, 2008. At the oral arguments on May 9, 2008, debtors/appellants Anders Knudsen and Cynthia Knudsen were represented by Joseph A. Peiffer of Day Rettig Peiffer, P.C., in Cedar Rapids, Iowa, and appellee IRS was

represented by Julie Saltman, a trial attorney in the Tax Division of the United States Department of Justice in Washington, D.C.

At the conclusion of the oral arguments, the court authorized the IRS to file a post-hearing brief within ten days and authorized the Knudsens to file a post-hearing reply brief ten days after the IRS filed its brief. The IRS filed its post-hearing brief (docket no. 44) on May 19, 2008. The Knudsens filed their post-hearing brief (docket no. 45) on May 29, 2008.

The court found the briefing in this case, by the parties and amicus, to be particularly thorough and informative, and also found the oral arguments to be unusually well-prepared and effectively presented. The cross-appeals in this matter are now fully submitted.

## II. LEGAL ANALYSIS

### A. Standard Of Review

A district court has jurisdiction to hear appeals from a bankruptcy court pursuant to 28 U.S.C. § 158. *See In re Gaines*, 932 F.2d 729, 731 (8th Cir. 1991). "'When a bankruptcy court's judgment is appealed to the district court, the district court acts as an appellate court and reviews the bankruptcy court's legal determinations de novo and findings of fact for clear error.'" *In re Falcon Prods., Inc.*, 497 F.3d 838, 841 (8th Cir. 2007) (quoting *In re Fairfield Pagosa, Inc.*, 97 F.3d 247, 252 (8th Cir. 1996)); *see In re Armstrong*, 291 F.3d 517, 521-22 (8th Cir. 2002); *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 379 (8th Cir. 2000); *In re Clark*, 223 F.3d 859, 862 (8th Cir. 2000); *In re Dakota Rail, Inc.*, 946 F.2d 82, 84 (8th Cir. 1991); Fed. R. of Bankr. P. 8013).

More specifically still, as to the principal issues presented here, this court reviews the bankruptcy court's interpretation of the bankruptcy code de novo. *See In re Zahn*, ___

F.3d ___, ___, 2008 WL 2130508, *1 (8th Cir. May 22, 2008); *In re Farmland Indus., Inc.*, 397 F.3d 647, 650 (8th Cir. 2005). Where issues are committed to the bankruptcy court's discretion, review is for abuse of discretion. *Id.* "'The bankruptcy court abuses its discretion when it fails to apply the proper legal standard or bases its order on findings of fact that are clearly erroneous.'" *Id.* (quoting *In re Farmland Indus., Inc.*, 397 F.3d at 651). The court will apply these standards to each of the issues now asserted by the parties in their cross-appeals of the bankruptcy court's November 20, 2006, order denying confirmation of the Knudsens' Chapter 12 reorganization plan, beginning with the Knudsens' issues. Before doing so, however, the court must also consider the rules for statutory interpretation, on which much of this appeal turns.

## B. Rules For Statutory Interpretation

The parties acknowledge that the issues presented here—and, hence, whether the bankruptcy court erred as a matter of law or fact—turn on matters of statutory interpretation, the meaning of the 2005 amendment to 11 U.S.C. § 1222(a)(2)(A). "Statutory interpretation is a question of law that [appellate courts] review de novo." *Minnesota Supply Co. v. Raymond Corp.,* 472 F.3d 524, 537 (8th Cir. 2006). The parties have cited no controlling interpretation of § 1222(a)(2)(A) or, indeed, any judicial interpretation at all of § 1222(a)(2)(A) in several pertinent respects, so that, on the questions of first impression or limited prior consideration by other courts, this court must be guided principally by the rules of statutory interpretation.

This court has, on numerous occasions, pointed out that the first approach to statutory interpretation is the "plain language" of the statute in question. *See, e.g., B & D Land & Livestock Co. v. Veneman,* 332 F. Supp. 2d 1200, 1210 (N.D. Iowa 2004); *Kinkaid v. John Morrell & Co.,* 321 F. Supp. 2d 1090, 1103 n. 3 (N.D. Iowa 2004) (citing

such reiterations); *accord United States v. Cacioppo,* 460 F.3d 1012, 1016 (8th Cir. 2006). This rule applies with equal force to interpretation of provisions of the Bankruptcy Code. *See In re Hen House Interstate, Inc.*, 177 F.3d 719, 722 ("The proper construction of any statute, the Bankruptcy Code included, begins with the language of the statute itself.") (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989), which construed § 506(b) of the Bankruptcy Code; *In re Martin*, 140 F.3d 806, 807-08 (8th Cir. 1998) (when construing provisions of the Bankruptcy Code, the court "looks to the express language and overall purpose"). The Supreme Court describes this rule as the "one, cardinal canon before all others." *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253 (1992). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Id.* (citing *Ron Pair Enters., Inc.,* 489 U.S. at 241-42; *United States v. Goldenberg,* 168 U.S. 95, 102-03 (1897); *Oneale v. Thornton,* 10 U.S. (6 Cranch) 53, 68, 3 L.Ed. 150 (1810)). When the language of the statute is plain, the inquiry also ends with the language of the statute, for in such instances "the sole function of the courts is to enforce [the statute] according to its terms." *Ron Pair,* 489 U.S. at 241 (quoting *Caminetti v. United States,* 242 U.S. 470, 485 (1917)); *Cacioppo,* 460 F.3d at 1016 ("Where the language is plain, we need inquire no further.") (citing *Ron Pair,* 489 U.S. at 241).

Unfortunately, as this court has also noted, "plain meaning, like beauty, is sometimes in the eye of the beholder." *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 737 (1985). Therefore, courts may well disagree on the "plain meaning" of a statute, because more than one reading of the statute may be reasonable or at least possible. *See id.* at 736 (although the statute could be read as the appellate court construed it, the statute could also be read in a different way). Consequently, when a statute is capable of more than one reasonable reading (even readings that have been taken by different courts to be

the "plain meaning" of the statute), it is ambiguous on its face. *Id.*; *United States v. White Plume,* 447 F.3d 1067, 1074 (8th Cir. 2006) ("Under statutory interpretation, a statute is ambiguous if it is 'capable of being understood in two or more possible senses or ways.'") (quoting *Chickasaw Nation v. United States,* 534 U.S. 84, 90 (2001), in turn quoting WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 77 (1985)). When a statute is ambiguous, the court may seek guidance in the statutory structure, relevant legislative history, congressional purposes expressed in the pertinent act, and general principles of law applicable to the circumstances of the statute to determine the appropriate interpretation. *Id.* at 737; *see also In re Martin*, 140 F.3d at 808 (when construing provisions of the Bankruptcy Code, the court "looks to the express language and overall purpose").[2]

Finally, in the specific context presented here, ambiguities in the Bankruptcy Code must be resolved in favor of the debtor. *See Wright v. Union Central Life Ins. Co.*, 311 U.S. 273, 279 (1940) (J. Douglas) (in a bankruptcy appeal brought under the Bankruptcy Act, the court noted that "the Act must be liberally construed to give the debtor the full measure of the relief afforded by Congress, lest its benefits be frittered away by narrow formalistic interpretations which disregard the spirit and letter of the Act"); *New Neighborhoods, Inc. v. West Virginia Workers' Compensation Fund*, 886 F.2d 714, 719 (4th Cir. 1989) ("Further, ambiguities in the Code are generally resolved in favor of the debtor."); *In re Green*, 360 B.R. 34, 42 (Bankr. N.D.N.Y. 2007) ("[A]mbiguities in the

---

[2]Courts will also construe an ambiguous statute to avoid serious constitutional problems, *see Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 575 (1988) (citing *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 499-501, 504 (1979)), but none of the parties asserts that the ambiguity of § 1222(a)(2)(A) is a matter of constitutional proportions.

Code should be resolved in favor of the Debtor."); *In re Barnick*, 353 B.R. 233, 246 (Bankr. C.D. Ill. 2006) ("More generally, ambiguities in the Bankruptcy Code must be resolved in favor of the debtor."); *In re Payne*, 27 B.R. 809, 817 (Bankr. D. Kan. 1983) ("Moreover, ambiguities in the Code must be resolved in favor of the debtor, not the creditor.").

## C.  The Farmers' Issues On Appeal

### 1.     The statute at issue

The Knudsens' appeal involves the appropriate interpretation of 11 U.S.C. § 1222(a)(2), as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").  Prior to April 20, 2005, § 1222(a)(2) provided as follows:

> (a) The plan shall—
>        * * *
> (2) provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507 of this title, unless the holder of a particular claim agrees to a different treatment of such claim.

11 U.S.C. § 1222(a)(2) (2004).  Thus, former § 1222(a)(2) required full payment, in deferred cash payments, of all priority claims as defined by 11 U.S.C. § 507, unless the claimant agreed to different treatment.

In the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Congress amended § 1222(a)(2), effective April 20, 2005, in pertinent part, as follows:

> (a) The plan shall—
>        * * *
> (2) provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507, unless—

> (A) the claim is a claim owed to a governmental unit that arises as a result of the sale, transfer, exchange, or other disposition of any farm asset used in the debtor's farming operation, in which case the claim shall be treated as an unsecured claim that is not entitled to priority under section 507, but the debt shall be treated in such manner only if the debtor receives a discharge; or
>
> (B) the holder of a particular claim agrees to a different treatment of that claim. . . .

11 U.S.C. § 1222(a)(2)(A).[3] Thus, as amended, § 1222(a)(2) plainly creates a new exception to priority status by stripping priority from claims of "a governmental unit" that "arise" from a transaction involving "any farm asset used in the debtor's farming operation," but "only if the debtor receives a discharge." *See*, *e.g.*, *B & D Land & Livestock Co.*, 332 F. Supp. 2d at 1210 (the first approach to statutory interpretation is the "plain language" of the statute in question); *accord In re Hen House Interstate, Inc.*, 177 F.3d at 722 (interpretation of provisions of the Bankruptcy Code begins with the plain meaning of the statute); *In re Martin*, 140 F.3d at 807-08 (same).

Unfortunately, what is not plain from the statutory language is the meaning of the phrase "any farm asset used in the debtor's farming operation"; how taxes subject to beneficial treatment under § 1222(a)(2)(A) and those that are not are to be allocated; and how § 1222(a)(2)(A) is to be applied to post-petition taxes. Indeed, the parties and amicus

---

[3]Section 1222(a)(2)(A) took effect on the date of the BAPCPA's enactment, April 20, 2005, while most other provisions of the BAPCPA took effect for bankruptcy petitions filed 180 days after the date of enactment. *See* Pub. L. No. 109-8, § 1003(a), § 1501, 119 Stat. 23, 216 (2005). Because the Knudsens filed their bankruptcy petition on July 1, 2005, the court must give effect to § 1222(a)(2)(A), as amended, while recognizing that most of the other provisions of the BAPCPA are not in effect for the purposes of this litigation.

all agree that the statute is ambiguous on these points. The court will consider these ambiguities in turn, beginning with those raised by the Knudsens' appeal.

## 2. Treatment of taxes on the sale of slaughter hogs

### a. The bankruptcy court's decision

The Knudsens contend, first, that the bankruptcy court erred when it excluded their pre-petition sale of slaughter hogs in 2004 from the benefit provided by 11 U.S.C. § 1222(a)(2)(A). *See In re Knudsen*, 356 B.R. 480, 485-86 (Bankr. N.D. Iowa 2006). As the bankruptcy court characterized this first issue, the Knudsens had argued that § 1222(a)(2)(A) should be extended to tax debt arising from the sale or other disposition of any farm asset, when such disposition was made in furtherance of restructuring the farmer's operation, either before or after the filing of the Chapter 12 petition. On the other hand, the IRS had argued that the phrase "used in the debtor's farming operation" in § 1222(a)(2)(A) should be given the same meaning and treatment as similar language, "property used in the trade or business," in 26 U.S.C. § 1231(b)(3), a provision of the Internal Revenue Code, which provides capital gain treatment for taxes arising from the sale of breeding livestock. This provision of the Internal Revenue Code, the Bankruptcy court concluded, is limited to capital assets. *Id.* at 485.

The bankruptcy court's analysis of this issue was as follows:

> I agree with the IRS on this issue. Although the phrases in § 1231(b) of the Internal Revenue Code and in § 1222(a)(2)(A) of the Bankruptcy Code are not the same, I conclude that the term "used" as contained in both phrases should be given the same meaning. The lack of total equivalence in the phrases results from the application of § 1231 to a wide range of business enterprises, whereas § 1222(a)(2)(A) deals only with farming, and therefore is more specific.

The use of a term of art that has an accepted meaning in tax law should be given the same meaning in a tax context in the Bankruptcy Code. *Colsen v. United States*, 322 B.R. 118, 122 & n. 5 (8th Cir. BAP 2005), *aff'd*, 446 F.3d 836 (8th Cir. 2006). I infer that Congress in drafting § 1222(a)(2)(A) was considering farm sales in the context of the Internal Revenue Code.

I find no decisions on this issue. However, a respected bankruptcy treatise is supportive on this point:

> The exception for claims owed to governmental units was enacted as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 and has no counterpart in chapter 11 or chapter 13. It presumably was intended to render capital gains taxes on disposition of farm assets into general unsecured claims for purposes of treatment under a chapter 12 plan.

8 Collier on Bankruptcy, ¶ 1222.02[2] at 1222-5 (15th ed. rev.2006).

I conclude that the sales by Knudsens of slaughter hogs in 2004 do not qualify for § 1222(a)(2)(A) treatment as sales of "farm asset[s] used in the debtor's farming operation."

*In re Knudsen*, 356 B.R. at 485-86.

### b. *Arguments on appeal*

In their pre-hearing brief, the Knudsens argue that interpretation of the key phrase in the statute, "any farm asset used in the debtor's farming operation," should focus on "any." Thus, they argue that the statute should be given as expansive an interpretation as possible, without tying it to a definition in the Internal Revenue Code. They contend that doing so will make the statute better serve the remedial purpose of relieving family farmers of the tax burdens of transactions to establish a workable reorganization plan and will not require reinterpretation of the statute when the tax code is modified. In other words, they contend that the substance of the statute should not rest on the assumption that Congress

intended that the terms in it would have the identical meaning in the Bankruptcy Code as they have in the Internal Revenue Code.

The Knudsens also point out that there is no reference to "capital" assets in either the statute or in Senator Grassley's comments on the purpose and scope of the statutory language when it was first offered as an amendment in 2000, nor is there any limitation to "breeding" livestock which would qualify as "capital assets" in either the statute or Senator Grassley's comments. Rather, Senator Grassley referred to taxes on sales of "livestock" as one source of the problems facing family farmers who liquidate assets to reorganize their farming operations. Thus, the Knudsens argue that, when the statutory language is read in the context of the problems facing family farmers attempting to reorganize and Senator Grassley's comments, it is apparent that the statute was intended to apply to "any" farm asset used in the debtor's farming operation.

Next, the Knudsens argue that which of the competing interpretations of the statute is chosen will determine whether or not their reorganization plan is feasible, so that a reading that permits their reorganization is in keeping with Congress's intent. They also contend that the bankruptcy court's interpretation results in dissimilar results for similarly situated farmers, citing as an example the difference in treatment for a farmer's liquidation of harvested crops, which would be treated as a sale of products and, thus, not eligible for § 1222(a)(2) treatment, and a farmer's liquidation of growing crops in a sale with crop land, which would be treated as a sale of capital assets, which would be eligible for § 1222(a)(2) treatment. Finally, they contend that the bankruptcy court's construction, which ties the meaning of § 1222(a)(2) to the tax code definition of "capital assets," would subject the applicability of the statute to the vagaries of amendments to the holding periods for such assets.

In its pre-hearing brief, the IRS contends that the parties agree that the slaughter hogs are "farm assets," but nevertheless asserts that § 1222(a)(2), as amended, does not apply to slaughter hogs, because the slaughter hogs were not "used in the debtor's farming operation." In the IRS's view, this is so, because the slaughter hogs were not used to create and finish a farm product for market, but were the farm products themselves, which were then sold to produce farm income. The IRS contends that the apparent ambiguity in § 1222(a)(2)(A) may be resolved by reference to other sources, with preference given to tax sources, because the words of the statute are used in a tax context. The IRS points out that the comparable phrase "property used in the trade or business" in 26 U.S.C. § 1231, a tax code provision, provides a specific definition for livestock that focuses on the length of time the animals were owned and on the purpose of ownership, including animals for draft, breeding, dairy, or sporting purposes, but excluding animals held as inventory or as property for sale to customers in the ordinary course of business, citing § 1231(b)(3) and (b)(1)(A) and (B). Under this definition, the IRS contends that it is apparent that the slaughter hogs were best treated as products of the debtors' farming operations held for sale to customers, not assets "used in" the farming operation. The IRS contends that the debtors (and the bankruptcy court) have oversimplified the IRS's position as an assertion that qualifying farm assets must be "capital" assets as that term is used in § 1231, when there is no reference to "capital assets" in § 1231. Instead, the IRS explains that it is drawing on § 1231 for its definition of "used in." When the IRS's reliance on § 1231 is properly understood, the IRS contends that the supposed vagaries in the treatment or definitions of "capital assets" and Senator Grassley's comments on language later enacted as § 1222(a)(2)(A) do not warrant ignoring or making superfluous the actual language of the statute, which qualifies the phrase "any farm asset" with "used in the debtor's farming operation."

Amicus curiae argues that both parties have presented too narrow a view of the relevant provision: The court is not asked to interpret a federal income tax provision found in the Bankruptcy Code, nor any provision of the Internal Revenue Code. Rather, amicus curiae argues that § 1222(a)(2)(A), as a priority-stripping provision applicable to "claims" of "governmental units," not just tax claims, should be construed in accordance with the Bankruptcy Code and bankruptcy policy to promote the effective reorganization of family farming operations. More specifically, amicus argues that the purposes and policies of the Bankruptcy Code will be frustrated by resort to the Internal Revenue Code and federal tax law, when, consistent with the Bankruptcy Code, bankruptcy law, and bankruptcy policies, the provision should be read to include any farm asset used by the debtor to further a Chapter 12 reorganization of farming operations. Amicus argues that defining terms in § 1222(a)(2) by using corresponding Bankruptcy Code definitions answers the question of what "used in" means without the need to consider any other source.

Specifically, amicus argues that 11 U.S.C. § 363 defines "use" of property of the estate in the ordinary course of business to cover all of the debtor's assets and not just deemed or defined capital assets. In contrast, amicus argues that using the definition of "used in" found in the Internal Revenue Code leads to an absurd result, because a debtor could never "use" inventory or proceeds from inventory. Amicus points out that, when Congress wants to identify a debtor's rights and powers in reference to a limited set of assets, such as capital assets, it says so, citing 11 U.S.C. § 1206 as an example. Amicus also points out that "farming operations" are defined in 11 U.S.C. § 101(21) in an illustrative, non-limiting manner. In short, amicus argues that the applicability of § 1222(a)(2) must satisfy both an "asset" test and a "use" test, where the latter test looks at whether the debtor will use that farm asset in the debtor's farm operations as ultimately

provided in the Chapter 12 plan. Here, amicus argues that non-priority treatment of the income tax generated by the sale of the slaughter hogs is necessary to an effective reorganization of the debtors, so that the slaughter hogs were "used in" the farming operation in a manner that brings their sale within the scope of § 1222(a)(2)(A).

In their pre-hearing reply brief,[4] the Knudsens argue that it is undisputed that they were required to sell their slaughter hogs as a condition precedent to the change in their farming operation from a farrow-to-finish operation to a custom feeding operation and that, without that sale, they could not proceed with their pre-petition plan of reorganization. Because the focus of Chapter 12 is allowing family farmers to reorganize, the Knudsens argue that their sale of slaughter hogs, thus, falls squarely within § 1222(a)(2)(A).

In its post-hearing brief, the IRS reiterates its argument that 26 U.S.C. § 1231 clarifies the appropriate interpretation of comparable "used in" language in § 1222(a)(2)(A). The IRS also reiterates that *Colsen v. United States*, 322 B.R. 118, 122 & n.5 (B.A.P. 8th Cir. 2005), *aff'd*, 446 F.3d 836 (8th Cir. 2006), authorizes courts to look to the tax code for definitions of terms in the bankruptcy code that are used in a tax context. The IRS explains that, looking to § 1231 for clarification, not for a wholesale transplant of definitions, the appropriate distinction to be drawn for § 1222(a)(2)(A) purposes is between assets "used in" the debtor's farming operation and farm assets simply sold for income. The IRS contends that, in *United States v. CF & I Fabricators of Utah, Inc.*, 518 U.S. 213 (1996), the Supreme Court also looked to related provisions of the Internal Revenue Code to interpret ambiguous provisions of the Bankruptcy Code, noting

---

[4]The Knudsens filed a pre-hearing reply brief (docket no. 28), a pre-hearing reply to the IRS's supplemental authorities (docket no. 31), and a post-hearing reply (docket no. 45). The Knudsens' argument summarized here is found only in the earliest pre-hearing reply brief (docket no. 28).

that the question is the nature of the provision to be interpreted. Here, the IRS explains that it is not suggesting that § 1222 should be read to apply only to livestock that is used in trade or business, as defined by § 1231, but that the court should look to the nature of the provision, which is to provide relief from high taxes arising from the sale of depreciated assets and land, which the IRS reiterates does not include taxes on the sale of farm products such as slaughter hogs. The IRS also seeks to distinguish *United States v. Energy Resources Company, Inc.*, 495 U.S. 545 (1990), on which the Knudsens rely for the proposition that Bankruptcy Code provisions should be interpreted to improve the likelihood of success of the debtor's reorganization, even if that interpretation is contrary to provisions of the Internal Revenue Code, on the ground that the holding in *Energy Resources Company* is narrow and applicable only to the facts of that case.

In their post-hearing brief, the Knudsens contend that the decision in *Energy Resources* does stand for the proposition that the court should rely upon the Bankruptcy Code, not the Internal Revenue Code, as the proper basis for interpreting Bankruptcy Code provisions, or the policies behind Chapter 12 and the Bankruptcy Code will be frustrated. They also contend that the bankruptcy court was inconsistent in relying on the Internal Revenue Code in its statutory interpretation on the first issue they appealed, but then relying on the Bankruptcy Code in its statutory interpretation on the issue appealed by the IRS. The Knudsens also contend that the IRS's reliance on *Reorganized CF&I Fabricators of Utah* for the proposition that the court should look to the Internal Revenue Code for guidance on the interpretation of § 1222(a)(2)(A) overlooks the portion of that decision explaining that Internal Revenue Code provisions are not dispositive in the bankruptcy context. They then reiterate that § 1222(a)(2)(A) involves more than mere federal income tax claims, so that reliance on the Internal Revenue Code for guidance here is inappropriate.

### c. *Analysis*

The analysis of the Knudsens' first issue involves the interpretation of the entire phrase "any farm asset used in the debtor's farming operation" in context. However, the parties' dispute concerning the meaning of this phrase revolves around the meaning of three separate portions of that phrase: "any farm asset," "used in," and "the debtor's farming operation."

### i. *Interpretation of "any farm asset. . . ."*

In pre-hearing briefing, the parties and amicus all appeared to agree that the slaughter hogs in question were "farm assets" within the meaning of § 1222(a)(2)(A), so that this first portion of the disputed phrase required no further interpretation. In its post-hearing brief, however, the IRS asserted that the court should draw a distinction between "any farm assets" within the meaning of § 1222(a)(2)(A) and farm products sold to produce farm income. This eleventh hour argument appears to the court to be another reincarnation of the IRS's principal contention, which is that the slaughter hogs were not "used in" the debtor's farming operation, as required to receive the benefits of § 1222(a)(2)(A), but assuming that the argument has separate significance, the court finds it unpersuasive. There is no question that the slaughter hogs were "assets," *i.e.*, "property," of the Knudsens. *See, e.g.,* 11 U.S.C. § 541(a) (defining property of the bankruptcy estate as including all of the debtor's legal or equitable interest in property at the time of the filing of the petition wherever located and by whomever held); 11 U.S.C. § 1207 (defining property of a chapter 12 estate as including other property in addition to the property specified in § 541). Nor is there any question that the slaughter hogs were related to or involved in the Knudsens' farming operation, rather than some non-farm business activity. *See, e.g.*, 11 U.S.C. § 101(18)(B) (defining a "family farmer," *inter alia*, in terms of percentage of "assets" consisting of "assets related to the farming operation" held by a corporation or partnership in which a

required percentage of stock or equity is held by family members). Therefore, even if the slaughter hogs were not "used in" the debtor's farming operation, the court concludes that, as a matter of law, they were "farm assets" within the meaning of § 1222(a)(2)(A).

   *ii.*     ***Interpretation of "the debtor's farming operation. . . ."***    Although the parties focus on the ambiguity of "used in" the debtor's farming operation, this court finds that there is also some ambiguity about the meaning of "the debtor's farming operation," at least when the phrase is read in isolation. For example, it appears to the court that the IRS examined whether the slaughter hogs sold in 2004 were "used" in "the debtors' farming operation" *as it existed before any reorganization*, that is, the IRS looked at whether slaughter hogs are "used" in a "farrow-to-finish" hog operation. In such a context, the sale of slaughter hogs would ordinarily be the sale of the *products* of the "farming operation," and the IRS's distinction between assets "used in" the farming operations—such as all the assets necessary to raise hogs from farrow to finish, including breeding stock—and assets that are "products" of the farming operations—such as the slaughter hogs, which are ordinarily sold to produce farm income—would certainly make some sense. In contrast, the Knudsens (and amicus) have focused on whether the slaughter hogs were "used" *in the reorganized farming operation*, and more specifically still, *in the reorganization of the farming operation* from a farrow-to-finish hog operation to a custom feeding operation.

   Viewing the phrase "the debtor's farming operation" within the statutory structure, not simply in isolation, *see Florida Power & Light Co.*, 470 U.S. at 737 (when a statute is ambiguous, the court may seek guidance, *inter alia*, in the statutory structure); *In re Martin*, 140 F.3d at 807-08 (when construing provisions of the Bankruptcy Code, the court "looks to the express language and overall purpose"), 11 U.S.C. § 101(21) provides a general—and open-ended—definition of "farming operation" for purposes of the

Bankruptcy Code as "includ[ing] farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state." Thus, as a general matter, "the debtor's farming operation" is broad enough to encompass both a farrow-to-finish hog operation, the Knudsens' original operation in and prior to 2004, and a custom hog-feeding operation, the Knudsens' reorganized operation, as both constitute "raising of . . . livestock." The context of the term in § 1222(a)(2)(A) is more specific, however: the phrase is used in § 1222(a)(2)(A) in the context of a transaction under "the plan," *i.e.*, the debtor's reorganization plan. *See* 11 U.S.C. § 1222(a)(2)(A) ("The plan shall provide" for payment of certain priority claims, with an exception for claims of a governmental unit arising from a transaction involving "any farm asset used in the debtor's farming operation"). Consequently, the court reads the phrase "debtor's farming operation" in § 1222(a)(2)(A) to mean *the farming operation under the reorganization plan*, not the farming operation as it existed before the farmer's attempt to reorganize.

This court's reading is also consistent with the limited legislative history for § 1222(a)(2)(A). *See Florida Power & Light Co.*, 470 U.S. at 737 (when a statute is ambiguous, the court may also seek guidance in the relevant legislative history). When the language that became § 1222(a)(2)(A) was originally introduced as part of the "Safety 2000" legislation in 1999, Senator Grassley—for himself and for Senators Daschle, Craig, Brownback, Sessions, Ashcroft, and Kohl—made the following relevant observations:

> But Chapter 12 can be made even better. "Safety 2000" will make Chapter 12 better. . . .
>
> "Safety 2000" also helps farmers to reorganize by keeping the tax collectors at bay. *Under current law, farmers often face a crushing tax liability if they need to sell livestock or land in order to reorganize their business affairs.* According to Joe Peiffer, a bankruptcy lawyer from Hiawatha,

Iowa, who represents many family farmers, high taxes have caused farmers to lose their farms. Under the bankruptcy code, the I.R.S. must be paid in full for any tax liabilities generated during a bankruptcy reorganization. If the farmer can't pay the I.R.S. in full, then he can't keep his farm. This isn't sound policy. Why should the I.R.S. be allowed to veto a farmer's reorganization plan? *"Safety 2000" takes this power away from the I.R.S. by reducing the priority of taxes during proceedings*. This will free up capital for investment in the farm, and help farmers stay in the business of farming.

145 Cong. Rec. S750-02, S764, 1999 WL 20426 (Jan. 20, 1999) (statement of Sen. Grassley on S.260) (emphasis added).[5] By emphasizing the effect of tax claims arising

---

[5]The court acknowledges that Senator Grassley's comments were in support of a predecessor amendment, albeit in identical language, to what ultimately passed in the 2005 BAPCPA, and that his comments are not entitled to the same relative weight in consideration of legislative history as committee reports, for example. *See, e.g., Disabled in Action of Metro. N.Y. v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000) ("We focus on the most authoritative and reliable materials of legislative history, including: the conference committee report, committee reports, sponsor/floor manager statement and floor and hearing colloquy. 'Because a conference report represents the final statement of terms agreed to by both houses, next to the statute itself it is the most persuasive evidence of congressional intent.' *Railway Labor Executives Ass'n v. ICC*, 735 F.2d 691, 701 (2d Cir. 1984) (citation omitted). "); *see also Kenna v. United States Dist. Court for C.D. Cal.*, 435 F.3d 1011, 1015 (9th Cir. 2006) ("Floor statements are not given the same weight as some other types of legislative history, such as committee reports, because they generally represent only the view of the speaker and not necessarily that of the entire body. However, floor statements by the sponsors of the legislation are given considerably more weight than floor statements by other members, *see NLRB v. St. Francis Hosp. of Lynwood*, 601 F.2d 404, 415 n. 12 (9th Cir. 1979), and they are given even more weight where, as here, other legislators did not offer any contrary views."); *United States v. Nelson*, 277 F.3d 164, 186 (2d Cir. 2002) ("In making this inquiry, we rely principally on the reports of the legislative Committees involved in drafting the statute and in steering it through Congress [and] . . . . eschew reliance on the passing comments of one Member,

(continued...)

from transactions during the family farmer's reorganization, this portion of the legislative history strongly suggests that the supporting senators contemplated that "the debtor's farming operation" referred to in § 1222(a)(2)(A) would mean *the farming operation under the reorganization plan*, not the farming operation as it existed before the farmer's attempt to reorganize.

Such a reading, focusing on the debtor's farming operation under the reorganization plan, is also consistent with the primary purpose of Chapter 12, *see Florida Power & Light Co.*, 470 U.S. at 737 (when a statute is ambiguous, the court may also seek guidance in congressional purposes expressed in the pertinent act); *In re Martin*, 140 F.3d at 807-08

---

[5](...continued)
and casual statements from the floor debates"), *cert. denied*, 537 U.S. 835 (2002); *Solite Copr. v. U.S. E.P.A.*, 952 F.2d 473, 136 (D.C. Cir. 1991) ("The statement of an individual senator carries little weight when there is other, more reliable legislative history, such as these committee reports, to the contrary."); *In re Kelly*, 841 F.2d 908, 912 n. 3 (9th Cir. 1988) ("[O]fficial committee reports [ ] provide the authoritative expression of legislative intent."); *Mills v. United States*, 713 F.2d 1249, 1252 (7th Cir. 1983) ("Committee reports represent the most persuasive indicia of Congressional intent with the exception, of course, of the [statute's] language."); *see also Board of Governors v. Inv. Co.*, 450 U.S. 46, 74-75, 101 S. Ct. 973, 67 L. Ed. 2d 36 (1981) (according special weight to relevant committee chairman's statements on Senate floor); *see also Conroy v. Aniskoff*, 507 U.S. 511, 521-22, 113 S. Ct. 1562, 123 L. Ed. 2d 229 (1993) (Scalia, J., concurring) (according special weight to statements by relevant committee chairmen when analyzing legislative history). Nevertheless, Senator Grassley's comments are entitled to considerable weight, because he was the sponsor of the amendment, his comments were joined by several other senators indicating bipartisan support, and there is no more reliable (or, indeed, any other) legislative history, and certainly none to the contrary, concerning the purpose and scope of the language that later became the BAPCPA amendment to § 1222(a)(2). *But see In re Hall*, 376 B.R. 741, 747 (Bankr. D. Ariz. 2007) (finding that Senator Grassley's comments are "not the legislative history of BAPCPA, but of legislation introduced in 1999," and finding the sparse legislative history on the BAPCPA "of little assistance in discerning legislative intent").

(when construing provisions of the Bankruptcy Code, the court looks, *inter alia*, to the "overall purpose" of the provision and the Code), which, likewise, is the reorganization of family farming operations. *See Rowley v. Yarnall*, 22 F.3d 190, 193 (8th Cir. 1994) (the purpose of Chapter 12 is "to provide family farmers with a faster, simpler, and cheaper alternative to Chapter 11 and Chapter 13 [reorganization] procedures, while preserving fair treatment of creditors under those chapters"); *Justice v. Valley Nat'l Bank*, 849 F.2d 1078, 1090 (8th Cir. 1988) (the purpose of Chapter 12 is "to 'give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land'") (quoting H.R. Rep. 554, 99th Cong., 2d Sess., 48, reprinted in 1986 U.S. Code Cong. & Admin. News 5249).

Therefore, the court concludes that "the debtor's farming operation" within the meaning of § 1222(a)(2)(A) is the debtor's farming operation *under the reorganization plan*.

*iii.    Interpretation of "used in" the debtor's farming operation*.    Having concluded that "the debtor's farming operation" at issue in § 1222(a)(2)(A) is the farming operation under the reorganization plan, the court turns to the question of what "used in" such a farming operation means.    Contrary to the contentions of the IRS and the conclusions of the bankruptcy court, this court does not find that "used in" in § 1222(a)(2)(A) should necessarily be given the same meaning as comparable language under 26 U.S.C. § 1231, a provision of the Internal Revenue Code.

This is so, because this court agrees with amicus that § 1222(a)(2)(A) is not simply a federal income tax provision found in the Bankruptcy Code, and certainly is not a provision of the Internal Revenue Code.    Rather, as amicus argues, according to its plain language, § 1222(a)(2)(A) is a priority-stripping provision applicable to "claims" of "governmental units," not just tax claims.    *See* 11 U.S.C. § 1222(a)(2)(A); *see also B & D*

*Land & Livestock Co.*, 332 F. Supp. 2d at 1210 (the first approach to statutory interpretation is the "plain language" of the statute in question); *accord In re Hen House Interstate, Inc.*, 177 F.3d at 722 (interpretation of provisions of the Bankruptcy Code begins with the plain meaning of the statute); *In re Martin*, 140 F.3d at 807-08 (same). No doubt the primary impetus for enactment of the priority-stripping measure was the effect of existing income tax liability on transactions in the course of reorganization, which Senator Grassley and his cohorts specifically identified as a problem for family farmers attempting to reorganize. *See* 145 Cong. Rec. S750-02, S764, 1999 WL 20426 (Jan. 20, 1999) (statement of Sen. Grassley on S.260) (quoted above). Nevertheless, the language ultimately chosen for § 1222(a)(2)(A) does not refer to "taxes" or "claims of the Internal Revenue Service," but much more broadly to "claims" of "governmental units," 11 U.S.C. § 1222(a)(2)(A), which would include claims of state and local taxing authorities, as well as federal taxing authorities, and also any of the numerous "governmental units" that provide farm subsidies, loans, programs, and benefits, where such "governmental units" might have security or other interests in a farmer's assets. Therefore, because § 1222(a)(2)(A) does not involve exclusively a tax context in the Bankruptcy Code, and, instead, plainly applies to various kinds of "claims," including non-tax "claims," the bankruptcy court's reliance on *Colsen v. United States*, 322 B.R. 118, 122 & n.5 (BAP 8th Cir. 2005), *aff'd*, 446 F.3d 836 (8th Cir. 2006), as warranting interpretation of "used in" in § 1222(a)(2)(A) consistent with its accepted meaning in tax law was misplaced. *See also Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. at 224 ("In sum, we conclude that the 1978 [Bankruptcy] Act reveals no congressional intent to reject generally the interpretive principle that characterizations in the Internal Revenue Code are not

dispositive in the bankruptcy context," so that the court must conduct a "functional examination" of the statutory provisions at issue.[6]

Rather, this court finds that, because the "claims" of "governmental units" terms in § 1222(a)(2)(A) refer to a larger context than taxes, ambiguous terms in the provision should be construed in accordance with the Bankruptcy Code and bankruptcy policy. *See Florida Power & Light Co.*, 470 U.S. at 737 (when a statute is ambiguous, the court may also seek guidance in congressional purposes expressed in the pertinent act); *In re Martin*, 140 F.3d at 807-08 (when construing provisions of the Bankruptcy Code, the court looks,

---

[6]The court is not entirely convinced, however, that *United States v. Energy Resources Co., Inc.*, 495 U.S. 545 (1990), stands for the broad proposition asserted by the Knudsens, that the court should rely upon the Bankruptcy Code, not the Internal Revenue Code, as the proper basis for interpreting Bankruptcy Code provisions, and may even do so in derogation of provisions of the Internal Revenue Code, or the policies behind Chapter 12 and the Bankruptcy Code will be frustrated. In *Energy Resources Company*, the Supreme Court observed,

> The [Bankruptcy] Code . . . grants the bankruptcy courts residual authority to approve reorganization plans including 'any . . . appropriate provision not inconsistent with the applicable provisions of this title.' 11 U.S.C. § 1123(b)(5); *see also* § 1129. The Code also states that bankruptcy courts may 'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions' of the Code. § 105(a). These statutory directives are consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships.

*Energy Resources Co., Inc.*, 495 U.S. at 549. Moreover, the Court stated that the Bankruptcy Code "requires the bankruptcy court to assure itself that reorganization will succeed." *Id.* However, the Court was also at pains to point out that interpretation of the statutory language at issue in that case consistent with bankruptcy policy did not actually contravene 26 U.S.C. § 6672 of the Internal Revenue Code. *See id.* at 550-51.

*inter alia*, to the "overall purpose" of the provision and the Bankruptcy Code). Again, the purpose of Chapter 12 is "to provide family farmers with a faster, simpler, and cheaper alternative to Chapter 11 and Chapter 13 procedures, while preserving fair treatment of creditors under those chapters," *Rowley*, 22 F.3d at 193, and "to 'give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land.'" *Justice*, 849 F.2d at 1090 (quoting H.R. Rep. 554, 99th Cong., 2d Sess., 48, reprinted in 1986 U.S. Code Cong. & Admin. News 5249). In light of such a purpose, an expansive reading is appropriate for farm assets "used in" the debtor's farming operation, that is, the farming operation under the reorganization plan. Indeed, the statute itself applies to "any farm asset," inviting a broad interpretation of how "any" asset is "used," where a wide variety of "farm assets" may have an equally wide variety of "uses" in the farming operation.

Even so, the proper interpretation of "used in" the debtor's farming operation is not limitless. As amicus suggests, the asset cannot be used in non-farm business operations, or it fails the "use test" embodied in § 1222(a)(2)(A). Moreover, because "the debtor's farming operation" is properly construed under § 1222(a)(2)(A) as the farming operation under the reorganization plan, the "asset" must be "used in" the farming operation under the reorganization plan, *i.e.*, to accomplish some purpose of the reorganization plan. The relevant legislative history is supportive of a reading that requires "use" of the farm asset to accomplish some purpose of the reorganization plan, *see Florida Power & Light Co.*, 470 U.S. at 737 (when a statute is ambiguous, the court may also seek guidance in the relevant legislative history), because the comments of Senator Grassley also tied the "use" of the assets to the purposes of the reorganization plan. Specifically, Senator Grassley was concerned about "the crushing tax liability" that family farmers face "if they need to sell livestock or land *in order to reorganize their business affairs*." 145 Cong. Rec. S750-02,

S764, 1999 WL 20426 (Jan. 20, 1999) (statement of Sen. Grassley on S.260) (emphasis added). Thus, the court concludes that, to qualify for the § 1222(a)(2)(A) exception to priority of applicable taxes, the "use" of the "farm asset" sold or otherwise disposed of must be for some purpose of the reorganization plan.

Finally, this court's liberal reading of "used in" the debtor's farming operation, which the parties agree is an ambiguous term, avoids the narrow and formalistic constraints imposed by the IRS's importation of a tax code construction, which would "fritter[] away" the benefits of § 1222(a)(2)(A) in stripping priority from "claims" of "governmental units," including tax and non-tax claims. *See Wright*, 311 U.S. at 279 (J. Douglas) (observing that "the [Bankruptcy] Act must be liberally construed to give the debtor the full measure of the relief afforded by Congress, lest its benefits be frittered away by narrow formalistic interpretations which disregard the spirit and letter of the Act"); *New Neighborhoods, Inc.*, 886 F.2d at 719 ("Further, ambiguities in the Code are generally resolved in favor of the debtor."); *In re Green*, 360 B.R. at 42 ("[A]mbiguities in the Code should be resolved in favor of the Debtor."); *In re Barnick*, 353 B.R. at 246 ("More generally, ambiguities in the Bankruptcy Code must be resolved in favor of the debtor."); *In re Payne*, 27 B.R. at 817 ("Moreover, ambiguities in the Code must be resolved in favor of the debtor, not the creditor."). Again, the goal of Chapter 12 is "to 'give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land.'" *Justice*, 849 F.2d at 1090 (quoting H.R. Rep. 554, 99th Cong., 2d Sess., 48, reprinted in 1986 U.S. Code Cong. & Admin. News 5249). Section § 1222(a)(2)(A) best serves that goal, if it is interpreted to apply to a broad range of transactions intended to effectuate the reorganization plan and, thus, to strip priority from a broad range of claims, because such an interpretation will make reorganization plans more feasible and, hence, more confirmable. In contrast, the IRS's interpretation would severely restrict the

"claims" to which the statute would apply and would, consequently, make reorganization plans less feasible and less confirmable.

For these reasons, the court concludes that, for § 1222(a)(2)(A) to apply, the "use" of the "farm asset" sold or otherwise disposed of must be for some purpose of the reorganization plan. The bankruptcy court erred, as a matter of law, in adopting the narrower interpretation advocated by the IRS, which required that the "farm asset" be "used" in the same manner as an asset under § 1231 and, consequently, would have applied essentially to "capital assets," not products or inventory of the farming operation. *See In re Falcon Prods., Inc.*, 497 F.3d at 841 (the district court's review of a decision of the bankruptcy court is de novo for legal determinations and clear error for findings of fact).

*iv.* ***Applicability of the statute***. Here, the court finds that the Knudsens did, indeed, "use" the slaughter hogs, which are "farm assets," in their "farming operation," that is, in the farming operation under the reorganization plan, and did so to accomplish some purpose of the reorganization plan, as required for § 1222(a)(2)(A) to apply. The bankruptcy court erred as both a matter of law and a matter of fact in concluding to the contrary. *See In re Falcon Prods., Inc.*, 497 F.3d at 841 (the district court's review of a decision of the bankruptcy court is de novo for legal determinations and clear error for findings of fact). Specifically, applying the correct construction of § 1222(a)(2)(A), under the proper legal standards, *see In re Zahn*, ___ F.3d at ___, 2008 WL 2130508 at *1 ("'The bankruptcy court abuses its discretion when it fails to apply the proper legal standard or bases its order on findings of fact that are clearly erroneous.'") (quoting *In re Farmland Indus., Inc.*, 397 F.3d at 651), the liquidation of the slaughter hogs was not merely the marketing of a product of the farming operation, but a "sale, transfer, exchange, or other disposition" of the "farm assets" in question that was required by SPI

as a precondition to reorganization of the Knudsens' farming operation from a farrow-to-finish operation to a custom feeding operation. The court does not find this to be any less the case, just because the Knudsens would presumably have sold the slaughter hogs in any event to produce farm income and would have (and did) use the proceeds of the sale to make a payment on the loan from St. Ansgar State Bank, which was secured by the slaughter hogs. Here, the actual sale was dictated by the "need to sell livestock . . . to reorganize [the Knudsens'] business affairs," *see* 145 Cong. Rec. S750-02, S764, 1999 WL 20426 (Jan. 20, 1999) (statement of Sen. Grassley on S.260) (explaining the impetus for the amendment that later became § 1222(a)(2)(A)), rather than by the market conditions that would ordinarily have dictated when and how farmers would sell livestock as the products of their farming operation.

Consequently, the bankruptcy court's disposition of this first issue on appeal will be reversed and remanded, and the Knudsens' pre-petition sale of slaughter hogs in 2004 is entitled to the benefit provided by 11 U.S.C. § 1222(a)(2)(A).

### 3. *Allocation of tax claims entitled to beneficial treatment*

#### a. *The bankruptcy court's decision*

The Knudsens' second issue on appeal is whether the bankruptcy court erred in applying the IRS's "proration method" to determine the amount of tax that qualifies for beneficial treatment under 11 U.S.C. § 1222(a)(2)(A), instead of their "marginal method." *See In re Knudsen*, 356 B.R. at 486-87. The Knudsens' "marginal method" would have required them to calculate a return for all income, then a second "pro forma" tax return removing all qualifying sales income, so that non-qualifying income would be taxed at lower marginal tax rates, resulting in a lower tax for income not entitled to beneficial treatment and greater likelihood that reorganization would be feasible. *In re Zahn*, ___ F.3d ___, ___, 2008 WL 2130508, *1 (8th Cir. May 22, 2008); *In re Farmland Indus.,*

*Inc.*, 397 F.3d 647, 650 (8th Cir. 2005). Where issues are committed to the bankruptcy court's discretion, review is for abuse of discretion. *Id.* "'The bankruptcy court abuses its discretion when it fails to apply the proper legal standard or bases its order on findings of fact that are clearly erroneous.'" *Id.* (quoting *In re Farmland Indus., Inc.*, 397 F.3d at 651).

In contrast, the IRS argued for a "proration method," pursuant to which the tax payer would prepare a tax return that recognizes total income and all deductions and exemptions and calculates the income tax based on all taxable income, then the IRS would calculate the percentage of total income attributable to sales of qualifying capital assets and the percentage of total income attributable to non-qualifying sources, and divide the income tax according to these percentages. The IRS would then add the total self-employment tax to the tax for the non-qualifying income, because such a tax is not based on income from the sale of capital assets, and subtract credits according to their relation to the sources of income. *Id.*

The bankruptcy court's analysis of this issue, in its entirety, was as follows:

> I find that the proration method is the better method for determining what amount of tax qualifies for beneficial treatment under § 1222(a)(2)(A) and what does not. It recognizes all income, deductions, exemptions, and credits in arriving at a tax and allocates according to the percentage of each type of income. It divides the actual tax without regard to which sales produced the last dollar of income.

*In re Knudsen*, 356 B.R. at 487.

### b.    Arguments on appeal

In their opening brief on appeal, the Knudsens argue that their "marginal method" for allocating taxes that qualify for beneficial treatment under § 1222(a)(2)(A) is the most appropriate method, because the IRS's "proration method" reduces the tax benefit of

§ 1222(a)(2)(A). They argue that the IRS's method ignores the marginal tax rate structure of the Internal Revenue Code and fails to recognize the intent of Chapter 12 and the 2005 amendments, which was to make it easier for farm debtors to reorganize their farming operations by freeing them of some of the tax burdens they would otherwise have to bear. Specifically, they contend that the IRS's method taxes all income at all rates, while their method allocates the tax on all of the income from the sales qualifying for § 1222(a)(2)(A) treatment to the highest marginal rate, resulting in a larger share of the taxes being stripped of priority status. For example, they assert that the IRS's method would make $45,146 of their taxes a priority claim, but would make only $10,166 unsecured and dischargeable, while their method would make only $12,591 of their taxes a priority claim, but would make $43,248 unsecured and dischargeable. They contend that the difference in non-dischargeable and dischargeable taxes under the two methods makes the difference in feasibility and confirmability of their reorganization plan. Thus, they contend that the more favorable result under their method is in keeping with the goals and policies of Chapter 12.

In its opening brief, the IRS points out that § 1222(a)(2)(A) is silent as to how the debtor's tax liability is to be allocated between non-priority and priority claims and that the calculation is complicated by the progressive marginal tax rates under the Internal Revenue Code, pursuant to which a 10% rate is applicable to the first dollar of taxable income, while a rate of up to 35% applies to additional dollars of taxable income. The IRS contends that the calculation is further complicated by the alternative minimum tax calculation, other income tax rates applicable to certain income, such as capital gains, the effects of income averaging, and other adjustments and deductions. The IRS contends that its method takes into account these adjustments, while the Knudsens' method, in effect, treats the income from the sale of certain farm assets as the last dollars of their income to

34

which the highest marginal tax rates would apply, thereby improperly maximizing the tax attributable to this income and the amount of tax to be treated as a non-priority claim under § 1222(a)(2)(A). The fundamental flaw with the Knudsens' approach, the IRS contends, is that it fails to treat every taxable dollar of income in a year as equal to the extent that each taxable dollar is treated equally by the Internal Revenue Code. The IRS contends that, even assuming that § 1222(a)(2)(A) is intended to give debtors more favorable tax treatment for certain transactions, the provision need not be read to provide debtors with every benefit imaginable. The IRS describes as "hyperbole" the Knudsens' assertion that § 1222(a)(2)(A) was intended to eliminate the IRS's veto power over confirmation of reorganization plans, because the statute still plainly gives the IRS the ability to assert that part of the debtor's income tax is a priority claim that must be provided for in the plan.

Amicus curiae weighs in on this issue, too. Amicus argues that the Knudsens' method ensures that there is no reduction in the overall governmental claim, but that there is also no indirect effect from what is now a non-priority general unsecured governmental claim. Amicus explains that there is no indication that § 1222(a)(2)(A) was intended to reduce the claim of any governmental unit, but that the priority-stripping provision should be construed to remove both the direct and indirect effects of what was a priority claim prior to the 2005 Amendments. Thus, amicus argues that the proper interpretation should remove any priority taint that might have crept into a governmental unit's claim by reason of the progressive marginal nature of the federal income tax laws. With these considerations in mind, amicus argues that the appropriate approach is one that would treat the § 1222(a)(2)(A) unsecured claim as "the last dollars in." Amicus argues that only the Knudsens' method has this effect. Amicus argues that, in contrast, the IRS's method preserves the entire claim, but also preserves some of the priority taint of the § 1222(a)(2)(A) claim that remains.

In their pre-hearing reply brief, the Knudsens contend that the bankruptcy court erred in choosing the IRS's proration method, because that method precludes a finding that their plan is confirmable. They cite *United States v. Energy Resources Co., Inc.*, 495 U.S. 545 (1990), as holding that it is appropriate for the bankruptcy court to favor reorganization, even when doing so is inconsistent with the Internal Revenue Code.[7] The Knudsens also point out that the IRS uses a marginal method to determine estate taxes for special use valuation, undermining the IRS's reliance on a different method here.

### c.    *Analysis*

There is no disputing that § 1222(a)(2)(A) is silent as to the proper allocation of taxes entitled to priority and non-priority treatment. That silence, however, is less surprising than it might be if § 1222(a)(2)(A) were, as the IRS contends and the bankruptcy court apparently found, a *tax* provision in the Bankruptcy Code, but this court finds that § 1222(a)(2)(A) is a priority-stripping provision applicable to more than tax claims. Indeed, the court finds that the misconception by the IRS and the bankruptcy court as to the nature of § 1222(a)(2)(A) as a *tax* provision led the bankruptcy court to choose the wrong method for allocating taxes entitled to beneficial treatment under § 1222(a)(2)(A) in the face of the statute's silence concerning the proper allocation method.

More specifically, this court agrees with the bankruptcy court that the "proration method" advocated by the IRS recognizes all income, deductions, exemptions, and credits in arriving at a tax, then allocates taxes according to the percentage of each type of income, and, finally, divides the actual tax without regard to which sales produced the last dollar of income. *In re Knudsen*, 356 B.R. at 487. Thus, as a matter of *tax* policy, and

---

[7]This court has already observed, *supra*, in note 6, that it cannot read *Energy Resources Company* to stand for such a broad proposition.

from a *tax* perspective, the "proration method" is appealing. The problem, however, is that, as this court concluded, above, according to its plain language, § 1222(a)(2)(A) is *not* a *tax* provision in a bankruptcy context, but a priority-stripping provision applicable to "claims" of "governmental units," not just tax claims. *See* 11 U.S.C. § 1222(a)(2)(A); *see also B & D Land & Livestock Co.*, 332 F. Supp. 2d at 1210 (the first approach to statutory interpretation is the "plain language" of the statute in question); *accord In re Hen House Interstate, Inc.*, 177 F.3d at 722 (interpretation of provisions of the Bankruptcy Code begins with the plain meaning of the statute); *In re Martin*, 140 F.3d at 807-08 (same). Just as the directive in *Colsen*, 322 B.R. at 122 & n.5, to look to the tax code for definitions of terms in the bankruptcy code that are used in a tax context is inapplicable to interpretation of the terms of § 1222(a)(2)(A), it is improper to interpret this provision more generally from a tax perspective or as if it were set in an exclusively tax context, when § 1222(a)(2)(A) refers to a larger context than taxes, one involving "claims" of "governmental units." Thus, the ambiguity as to allocation of taxes between priority and unsecured claims resulting from application of the provision to *tax* claims should be construed in accordance with the Bankruptcy Code and bankruptcy policy. *See Florida Power & Light Co.*, 470 U.S. at 737 (when a statute is ambiguous, the court may also seek guidance in congressional purposes expressed in the pertinent act); *In re Martin*, 140 F.3d at 807-08 (when construing provisions of the Bankruptcy Code, the court "looks to the express language and overall purpose").

Interpreting the provision in its proper context in accordance with the Bankruptcy Code and bankruptcy policy means, *inter alia*, that ambiguous provisions must be resolved in favor of the debtor. *See New Neighborhoods, Inc.*, 886 F.2d at 719 ("Further, ambiguities in the Code are generally resolved in favor of the debtor."); *In re Green*, 360 B.R. at 42 ("[A]mbiguities in the Code should be resolved in favor of the Debtor."); *In*

*re Barnick*, 353 B.R. at 246 ("More generally, ambiguities in the Bankruptcy Code must be resolved in favor of the debtor."); *In re Payne*, 27 B.R. at 817 ("Moreover, ambiguities in the Code must be resolved in favor of the debtor, not the creditor."). It also means that the provision must be interpreted consistent with the goal of Chapter 12 "to 'give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land.'" *Justice*, 849 F.2d at 1090 (quoting H.R. Rep. 554, 99th Cong., 2d Sess., 48, reprinted in 1986 U.S. Code Cong. & Admin. News 5249). Moreover, this provision must be construed in the context of its specific purpose, which according to the legislative history, *see Florida Power & Light Co.*, 470 U.S. at 737 (when a statute is ambiguous, the court may also seek guidance in the relevant legislative history), and contrary to the IRS's contention, was indeed, to take away the IRS's "veto" power over a family farmer's reorganization plan. *See* 145 Cong. Rec. S750-02, S764, 1999 WL 20426 (Jan. 20, 1999) (statement of Sen. Grassley on S.260) ("Why should the I.R.S. be allowed to veto a farmer's reorganization plan? *"Safety 2000" takes this power away from the I.R.S. by reducing the priority of taxes during proceedings*. This will free up capital for investment in the farm, and help farmers stay in the business of farming.") (emphasis added).

Thus, in light of the ambiguity of the provision, the requirement to select the interpretation of § 1222(a)(2)(A) that best serves bankruptcy policy and the purposes of § 1222(a)(2)(A) itself, and in light of the further requirement that the court construe the ambiguity in the Bankruptcy Code in favor of the debtor, *see, e.g., New Neighborhoods, Inc.*, 886 F.2d at 719 ("Further, ambiguities in the Code are generally resolved in favor of the debtor."), this court agrees with the Knudsens and amicus that the bankruptcy court should have adopted the "marginal method" to determine the allocation of taxes that are treated as a priority claim and those that are treated as an unsecured claim under § 1222(a)(2)(A). By treating the proceeds of transactions that qualify for beneficial

treatment under § 1222(a)(2)(A), in effect, as the "last dollars in," and, therefore, subject to the highest marginal tax rate, the "marginal method" maximizes the percentage of the taxes to which beneficial (unsecured) treatment will apply, reducing the IRS's "veto" power, and making the debtors' reorganization plan more feasible and, hence, more confirmable. The IRS's method, in contrast, would minimize the taxes entitled to beneficial treatment and reinstate much of the IRS's "veto" power, thereby "fritter[ing] away" the benefits of § 1222(a)(2)(A) in stripping priority from "claims" of "governmental units," at least to the extent that such "claims" are tax claims. *See Wright*, 311 U.S. at 279 (J. Douglas) (observing that "the [Bankruptcy] Act must be liberally construed to give the debtor the full measure of the relief afforded by Congress, lest its benefits be frittered away by narrow formalistic interpretations which disregard the spirit and letter of the Act"). The Knudsens' approach does not, however, entirely eliminate the IRS's "veto" power, which, consistent with the plain language of § 1222(a)(2)(A), *see B & D Land & Livestock Co.*, 332 F. Supp. 2d at 1210 (the first approach to statutory interpretation is the "plain language" of the statute in question); *accord In re Hen House Interstate, Inc.*, 177 F.3d at 722 (interpretation of provisions of the Bankruptcy Code begins with the plain meaning of the statute); *In re Martin*, 140 F.3d at 807-08 (same), remains in place to the extent that the family farmer's reorganization plan does not provide for the payment of the priority portion of the claim or the family farmer still fails to obtain a discharge under the reorganization plan. *See* 11 U.S.C. § 1222(a)(2) (subject to the exception § 1222(a)(2)(A), the plan must provide for payment of priority claims, and the claims subject to the exception are only treated as unsecured "if the debtor receives a discharge").

Therefore, the "marginal method" is the correct method to determine the allocation of taxes between priority and non-priority claims. To apply that method, the Knudsens should calculate a return for all income, then a second "pro forma" tax return removing

all qualifying sales income, so that non-qualifying income would be taxed at lower marginal tax rates, and the taxes shown on the "pro forma" return would represent the portion of the tax claim entitled to priority status, while the difference between the taxes shown on the return for all income and the taxes shown on the "pro forma" return would represent the unsecured portion of the tax claim. The bankruptcy court erred, as a matter of law, in choosing the "proration method" instead. *See In re Falcon Prods., Inc.*, 497 F.3d at 841 (the district court's review of a decision of the bankruptcy court is de novo for legal determinations). The portion of the bankruptcy court's Decision Re Plan Confirmation choosing the "proration method" will be reversed and remanded.

## D.  The IRS's Cross-Appeal

### 1.      The pertinent part of the bankruptcy court's ruling

The IRS cross-appeals some or all of the bankruptcy court's ruling on what that court identified as Issues (5) and (6)—application of § 1222(a)(2)(A) to post-petition taxes and discharge of post-petition taxes. A review of this part of the bankruptcy court's ruling may help clarify the scope of the IRS's cross-appeal.

In the pertinent part of its ruling, the bankruptcy court considered the Knudsens' contention that the tax generated by the post-petition sales of farm assets, including land, machinery, and equipment, should receive the favorable treatment provided by § 1222(a)(2)(A), that such taxes could be paid through the estate as administrative expenses and that, ultimately, non-priority portions of the taxes could be discharged, noting that the IRS disagreed and objected as to each contention. The bankruptcy court explained that the IRS had summarized its objection to the plan treatment of post-petition taxes as follows: "'In the present case, Debtors are attempting to pay the postpetition taxes, as administrative expenses, through their Chapter 12 Plan and to discharge their postpetition

tax liability as part of their Chapter 12 Plan. But, because the postpetition taxes would not be "incurred by the estate,["] the postpetition taxes would not be pre-BAPCPA administrative expenses and would not be an "allowed" expense under pre-BAPCPA § 503.'" *In re Knudsen*, 356 B.R. at 490 (quoting IRS brief, doc. 172, p. 14).

The bankruptcy court disagreed with the IRS's argument, as follows:

> Although confirmation of a plan may, under § 1227(b), vest "all of the property of the estate in the debtor," that does not mean the estate ceases to exist, although it may give the debtor control of the property. *See Security Bank of Marshalltown, Iowa v. Neiman*, 1 F.3d 687, 691 (8th Cir. 1993) (estate continues to exist after confirmation of chapter 13 plan). Knudsens' estate may continue to hold property that is necessary for the effectuation of the plan, and debtors may sell the estate property in the performance of the plan.

> Also I disagree that taxes incurred postpetition by the individual debtors cannot be administrative expenses for the purposes of payment under the plan. In a bankruptcy case, the payment of the tax imposed against a debtor may still be "divided into separate components in accordance with the bankruptcy laws determining the priority of payment of those claims." *Missouri Dept. of Revenue v. L.J. O'Neill Shoe Co. (In re L.J. O'Neill Shoe Co.)*, 64 F.3d 1146, 1152 (8th Cir. 1995). I rely on the Circuit Court's decision in *O'Neill Shoe Co.*, a chapter 11 corporate case, in determining that although Knudsens' chapter 12 estate is not a separate taxable entity, Knudsens' plan may provide for payment of taxes arising from income earned after the filing of the petition, and such taxes may be treated for distribution purposes as administrative expenses under 11 U.S.C. § 503(b)(1)(B).

> Moreover, the plan may provide for treatment of a portion of these taxes as unsecured debt under § 1222(a)(2)(A), and upon entry of a discharge order, such taxes, including penalties and interest, would be discharged

under 11 U.S.C. § 1228(a) to the extent they are treated as unsecured.

The discharge provision of chapter 12 states that "after completion by the debtor of all payments under the plan . . . the court shall grant the debtor a discharge of all debts provided for by the plan allowed under section 503 of this title or disallowed under section 502 of this title. . . ." There seems to be a comma missing between the phrase "all debts provided for by the plan" and the phrase "allowed under section 503 of this title." I read the sentence to mean that debts allowed under section 503 are one category of debts dischargeable in chapter 12. *See* 8 Collier on Bankruptcy ¶ 1228.02[4][a] (discussing scope of chapter 12 discharge).

I conclude that a chapter 12 debtor may treat postpetition income taxes imposed on the debtor's income earned during the pendency of the case as administrative expenses under section 503 and that the plan may propose payment of such expenses by the estate.

I conclude also that the portion of such taxes which may be treated as unsecured under § 1222(a)(2)(A) may be discharged, including any accruing penalties and interest. As has been discussed, § 1222(a)(2)(A) permits treatment of § 507 claims owed to a governmental unit as nonpriority unsecured claims. Section 507 claims include administrative expenses allowed under § 503(b). 11 U.S.C. § 507(a)(1) (pre-BAPCPA). Section 503(b) administrative expenses include taxes incurred by the estate. Finally, treating such taxes as unsecured permits their discharge without the requirement of payment in full.

*In re Knudsen*, 356 B.R. at 490-91.

The bankruptcy court agreed with the parties that "the statute is ambiguous," *id.* at 491, although it is not entirely clear to this court which of the many statutes cited in the immediately preceding portion of the bankruptcy court's ruling the bankruptcy court meant. Despite ambiguity of the statute, the bankruptcy court concluded "that Congress

intended to help farmers reorganize and stay in business by lessening the burden of prepetition and postpetition taxes arising from the sale of assets used in the farmer's farming operation, assets such as equipment and land," noting that "Congress placed the entire burden for such intention on § 1222(a)(2)(A)." *Id.* (and citing 8 Collier on Bankruptcy ¶ 1222.02[2]). The bankruptcy court also found Senator Grassley's comments, quoted above, to be helpful on this point, because they "indicate[d] that § 1222(a)(2)(A) was intended to apply to sales during the chapter 12 proceeding." *Id.* at 492. Therefore, the bankruptcy court concluded that "Knudsens may pay through the estate, as administrative expenses, income taxes incurred by them during the pendency of the case, that they may treat a portion of such taxes as nonpriority unsecured claims under the plan pursuant to § 1222(a)(2)(A) and that such nonpriority unsecured taxes incurred postpetition may be discharged with prepetition unsecured debts after completion of the plan." *Id.*

### 2. *The scope of the IRS's cross-appeal*

Although the IRS indicated that its cross-appeal related to the portion of the bankruptcy court's ruling concerning what that court identified as Issues (5) and (6), the IRS framed the sole issue in its cross-appeal as whether the bankruptcy court erred in attributing income from the post-petition sale of farm assets to the bankruptcy estate and not the debtors.[8] This issue, as framed and briefed by the IRS pre-hearing did not expressly raise the question of whether § 1222(a)(2)(A) applies to post-petition sales of

---

[8]In the parties' Joint Designation Of Record And Statement of Issues (docket no. 15), the IRS also presented another issue, whether the bankruptcy court erred in treating the portion of the IRS's claim arising from the sale of certain farm assets as a non-priority unsecured claim when examining the debtors' plan under the "best interest of the creditors" test, which was identified as Issue (3) in the bankruptcy court's ruling. However, in its Brief (docket no. 24) at 2, the IRS expressly withdrew its appeal on this issue and asserted that it was seeking review only of the issue stated above, in the body.

assets, although the bankruptcy court had addressed that question in its disposition of Issues (5) and (6). *In re Knudsen*, 356 B.R. at 490-92. The question of whether § 1222(a)(2)(A) applies to post-petition sales of assets was nevertheless raised and argued by both the Knudsens and amicus in their pre-hearing briefs as part of their arguments concerning the IRS's cross-appeal. *See* Appellants' Reply Brief (docket no. 28), 18; Brief of Amicus Curiae (docket no. 27), 30. Even so, the IRS made only one apparently stray reference to that issue in the "Conclusion" to its pre-hearing reply (docket no. 39) at 5, as follows: "For the reasons set forth above, this Court should follow the court in *Hall* and hold that because postpetition taxes cannot be incurred by the Chapter 12 estate, the liabilities must be collected outside of the bankruptcy *and Section 1222(a)(2)(A) is not applicable to the liabilities*." (Emphasis added). The court believes this reference to the applicability of § 1222(a)(2)(A) to post-petition sales to be "stray," because the IRS had not otherwise referred to this contention or supported it with any argument in either its original pre-hearing brief or its reply. Thus, it is far from clear from the IRS's pre-hearing briefing that the IRS intended to appeal the bankruptcy court's conclusion that § 1222(a)(2)(A) applies to post-petition sales of assets.

The issue (or issues) presented in the IRS's cross-appeal, however, "morphed" in the course of the May 9, 2008, oral arguments. In its oral argument, the IRS framed the issue as the debtors "in effect asking the Court to fix what they say Congress failed to do when it passed the [BAPCPA]." Realtime Transcript at 89. The IRS then argued, *inter alia*, that § 1222(a)(2)(A) does not apply to post-petition sales. Realtime Transcript at 89-90 (quoted below). Thus, at least in its oral arguments, the IRS squarely presented the question of whether § 1222(a)(2)(A) applies to post-petition sales of assets. The Knudsens were not surprised by the IRS's oral arguments concerning this issue, having raised the issue themselves in their pre-hearing briefing, and they ably responded to the IRS's

arguments on this issue with oral arguments of their own. *See, e.g.,* Realtime Transcript at 108-112. Therefore, the court concludes that the IRS's cross-appeal now encompasses not only the issue expressly identified in the Joint Designation Of Record And Statement of Issues (docket no. 15), but the related issue of whether § 1222(a)(2)(A) applies to post-petition sales of assets.

### 3. *Arguments on appeal*

In its written arguments in support of its cross-appeal, the IRS argues that, unlike cases under Chapter 7 or Chapter 11, in a Chapter 12 case, income cannot be attributed to a bankruptcy estate. Therefore, any taxes on post-petition income cannot be incurred by the estate and must eventually be paid by the debtors. The IRS points out that Chapter 7 and Chapter 11 estates have separate tax identification numbers and must file their own federal income tax returns, on which they must claim all post-petition tax-related activity of the estate, such as the sale of assets held by the estate. The IRS points out, however, that there is no separate, taxable estate in a Chapter 12 (or a Chapter 13) case. Under Chapter 12, therefore, debtors file one tax return for the entirety of the taxable year in which they filed their bankruptcy petition, post-petition income can only be incurred by the debtors, and taxes on that income cannot be treated as an administrative expense of the estate.

The IRS contends that *L.J. O'Neill Shoe*, 64 F.3d at 1152, on which the bankruptcy court relied to reach a contrary conclusion, is inapplicable, because the parties in *L.J. O'Neill Shoe* did not dispute that the portions of tax claims relating to the debtors' post-petition income were entitled to treatment as administrative expenses of the estate, but the debtors here are trying to bifurcate their *post-petition* income between the estate and themselves. The IRS also contends that amendments to 11 U.S.C. § 507 in the BAPCPA abrogated the ruling in *L.J. O'Neill Shoe*, because the amendments prohibit bifurcation of

income in bankruptcy cases, so that no part of the taxes from the year of the petition can be claimed as priority claims for unassessed taxes. The IRS also contends that *L.J. O'Neill Shoe* involved a Chapter 11 bankruptcy, but Chapter 12 was modeled more closely on Chapter 13, in which the bankruptcy estate is not a separate, taxable entity.

Next, the IRS contends that the bankruptcy court only considered post-petition taxes in the context of the proposed post-petition sale of physical assets owned at the time that the debtors filed their bankruptcy petition, but the debtors will continue to acquire property and earn money from services performed on their farm and from other jobs. Thus, these later assets and earnings become property of the estate, and the bankruptcy court's ruling would require that all income taxes attributable to these assets and earnings would also be treated as expenses incurred by the estate. This course, the IRS contends, would complicate the calculations upon plan confirmation, because, when some property revests with the debtors upon plan confirmation, some fraction of income tax would be incurred by the estate, but the remainder would be attributable to the debtor. In its Notice Of Supplemental Authority, the IRS cited one recent decision, *In re Hall*, 2007 WL 2851092 (Bankr. D. Ariz. Oct. 2, 2007), which supports its arguments on this issue.

Although the court finds no express argument in the IRS's pre-hearing briefs concerning the applicability of § 1222(a)(2)(A) to post-petition sales, the IRS raised that issue at oral arguments, arguing as follows:

> Before BAPCPA, all tax claims in a chapter 12 bankruptcy were priority tax claims under 507 that had to be paid in full in order for a plan to be confirmed. And these were all claims entitled to priority under 507 in which a return was due three years prior and tax was assessed 240 days prior to filing the petition.
> In passing BAPCPA Congress amended 1222(a)(2)(A) as we've been discussing and Congress carved out an

46

exception. Pre-petition tax liabilities arising from the sale of transfer exchange or other disposition of farm assets used in the debtor's farming operation were now subject to 1222 treatment. And what this means is that under the new 1222 these prepetition priority tax liabilities are treated as nonpriority unsecured—nonpriority unsecured debts.

Debtors ask the Court to extend the changes that Congress made to 1222 to also include post-petition liabilities. They want all taxes arising from the sale of farm assets used in the debtor's farm operation to be treated as general unsecured [claims] under 1222. Now, this is a significant change from pre-BAPCPA, and it's a significant change from the statute as it was amended by Congress in BAPCPA of 2005.

So the United States' position is that the statute with respect to this issue is unambiguous. The language was amended by Congress to provide this relief to debtors with respect to their pre-petition tax claim. It was not—Congress could have amended the statute to clearly create an exception for post-petition tax claims as well. However, Congress did not do that. . . .

Realtime Transcript at 89-90. At the oral arguments, the IRS also reiterated its written contentions that post-petition tax liabilities are not incurred by the bankruptcy estate, so that they cannot be treated as administrative expense claims. Realtime Transcript at 91-96, 101-05.

In their first pre-hearing reply brief, the Knudsens contend that adoption of the IRS's position would eviscerate § 1222(a)(2)(A), because it would make all taxes payable on all income reportable on post-petition income tax returns filed by the debtors and, thus, bar them from being paid from assets of the bankruptcy estate or from discharge under the priority-stripping provisions of § 1222(a)(2)(A). They also argue that the IRS's position will require all Chapter 12 debtors to pay all federal and income taxes during the year of

filing and throughout the plan after the discharge is entered, at which time, the debtors will be penalized for failure to timely pay the taxes. They contend, further, that the IRS's position will subject all Chapter 12 debtors to collection efforts by the IRS post-discharge. They contend that such results are "preposterous" and make a mockery of the Chapter 12 practice to date, pursuant to which the assets of the bankruptcy estate have been utilized to pay the post-petition income taxes incurred by the bankruptcy estate.

In their Reply To IRS['s] Supplemental Authority (docket no. 31), the Knudsens contend that following the *Hall* decision, on which the IRS relies, would lead to the illogical conclusion that no Chapter 12 or Chapter 13 case is confirmable, if any provision is made for payment of post-petition income taxes, because such income taxes could not be paid from assets of the bankruptcy estate. On the other hand, they argue that the Bankruptcy Code definition of "disposable income" of the debtor leads to the conclusion that post-petition income taxes must be paid prior to making payments to unsecured creditors. Otherwise, after a Chapter 12 or Chapter 13 bankruptcy is completed by the debtor, the debtor will face payment of all post-petition income taxes while the unsecured creditors will have benefitted by being paid before the taxes are paid.

In its own pre-hearing reply (docket no. 39), the IRS argues that recognition that the Chapter 12 estate is not a separate taxable entity means that the IRS must seek to recover post-petition taxes *outside of* the bankruptcy, not necessarily at the conclusion of the bankruptcy. The IRS contends that Congress structured Chapter 12 and Chapter 13 to allocate post-petition tax liabilities to the debtors, because debtors file one return for the entirety of the taxable year in which they file their petition, whereas Congress structured Chapters 7 and 11 to establish that the bankruptcy estate is a separate taxable entity that files its own tax return. The IRS contends that Congress intended Chapter 12 debtors to

be responsible for paying all of their post-petition debts in full, whether they are owed to the IRS or any other creditor.

Amicus also argues that the IRS's position would eviscerate § 1222(a)(2)(A), because it would deny the priority-stripping power of that section when it would be needed most, in the actual administration of the bankruptcy case after a Chapter 12 petition in bankruptcy has been filed. Amicus also argues that the allocation or bifurcation approach, which bifurcates corporate tax years in the year of filing, as articulated in *L. J. O'Neill Shoe*, is controlling law in this appeal. Contrary to the IRS's contentions, amicus argues that *L. J. O'Neill Shoe* is "chapter agnostic." Amicus also argues that *In re Brensing*, 337 B.R. 376 (Bankr. D. Kan. 2006), a Chapter 13 case holding that the debtor does not have property apart from the bankruptcy estate until the Chapter 13 plan is concluded, provides guidance here. Thus, amicus argues that it is proper to treat taxes on income of the property of the estate as administrative expenses of the estate.

### 4. *Analysis*

Four bankruptcy courts have now addressed the questions of whether § 1222(a)(2)(A) applies to post-petition sales of assets and consequently, whether taxes on such sales may be treated as administrative expenses of the bankruptcy estate. Three of those courts, including the court below, have held that § 1222(a)(2)(A) does apply to post-petition sales of assets and that the taxes on such sales may be treated as administrative expenses of the bankruptcy estate. *See In re Knudsen*, 356 B.R. at 490-92 (decision below); *accord In re Dawes*, 382 B.R. 509 (Bankr. D. Kan. 2008); *In re Schilke*, 379 B.R. 899 (Bankr. D. Neb. 2007). Only one court has reached the conclusions favored by the

IRS here.  *See In re Hall*, 376 B.R. 741 (Bankr. D. Ariz. 2007).[9]  No district courts or appellate courts have thus far addressed these issues.  Thus, this court is now presented with questions on which there is no controlling authority and what authority can be found is contradictory.

### a. *Applicability of § 1222(a)(2)(A) to post-petition transactions*

The court begins its analysis of the interrelated questions presented by the IRS's cross-appeal with the question of whether § 1222(a)(2)(A) applies to post-petition sales of assets.  Contrary to the IRS's contentions, nothing in the plain language of § 1222(a)(2)(A) restricts its applicability to pre-petition sales.  *See B & D Land & Livestock Co.*, 332 F. Supp. 2d at 1210 (the first approach to statutory interpretation is the "plain language" of the statute in question).  Rather, the statute states that priority is stripped from "a claim owed to a governmental unit that arises as a result of the sale, transfer, exchange, or other disposition of any farm asset used in the debtor's farming operation," without any express restriction to dispositions that occur before the filing of the bankruptcy petition.  *See* 11 U.S.C. § 1222(a)(2)(A).  Moreover, this court reasoned above, beginning at page 22, that the reference to "the plan" and transactions involving assets "used in the debtor's farming operation" in § 1222(a)(2)(A) indicated that the "farming operation" to which the statute applies is *the farming operation under the reorganization plan*, not the farming operation as it existed before the farmer's attempt to reorganize, and that  the "use" of the "farm asset" sold or otherwise disposed of must be for some purpose of the reorganization plan.

---

[9] A fifth court considered whether a debtor can treat unpaid post-petition taxes as an administrative expense of the estate *in a Chapter 13 plan*, and in so doing, considered the analysis of whether § 1222(a)(2)(A) allows post-petition taxes to be treated as general unsecured claims in *In re Dawes*, 382 B.R. at 512.  *See In re Whall*, 2008 WL 2246459 (Bankr. D. Mass. May 28, 2008) (slip op.).

Reorganization of the farming operation occurs both before and after the filing of the Chapter 12 petition, so that the language of § 1222(a)(2)(A) strongly suggests that the transactions to which § 1222(a)(2)(A) applies are both pre-petition and post-petition transactions. *Accord In re Schilke*, 379 B.R. at 902-03 ("[T]he the language of § 1222(a)(2)(A) indicates that it was intended to apply to taxes arising during the Chapter 12 proceeding. Specifically, it refers to 'a claim owed to a governmental unit that *arises* as a result of the sale, transfer, exchange, or other disposition of any farm asset used in the debtor's farming operation. . . .' (Emphasis added.) To interpret § 1222(a)(2)(A) as being inapplicable to taxes arising post-petition is effectively adding language to the statute that simply is not there.").

Assuming that § 1222(a)(2)(A) is ambiguous as to its applicability to post-petition transactions, however, the restriction of the claims at issue under that statute to "claims entitled to priority under section 507" does not impose, directly or by implication, a limitation on the applicability of § 1222(a)(2)(A) to claims arising from pre-petition dispositions of farm assets, as the IRS seems to suggest. *See Florida Power & Light Co.*, 470 U.S. at 737 (when a statute is ambiguous, the court may seek guidance, *inter alia*, in the statutory structure). Section 507(a)(8) (now and pre-BAPCPA) does identify as priority claims "allowed unsecured claims of governmental units" to the extent that they are for various pre-petition taxes, but that is not the only sort of § 507 tax claim potentially at issue here. Section 507(a)(2) (pre-BAPCPA § 507(a)(1)) also identifies priority claims for "administrative expenses under section 503(b) of this title." Section 503(b)(1)(B)(i), in turn, in its pre-BAPCPA form, defined "administrative expenses" as including "any tax

incurred by the estate, except a tax of a kind specified in section 507(a)(8) of this title."[10]

Such taxes could only be "incurred by the estate," within the meaning of § 503(b)(1)(B)(i), if they arose post-petition, or there simply would be no estate to "incur" them.[11] Moreover, as the bankruptcy court observed in *In re Dawes*, "'[A]dministrative expenses are generally those that are incurred by the estate after the entry of the order for relief.'" 382 B.R. at 513 (quoting 4 COLLIER ON BANKRUPTCY ¶ 507.01 (Alan N. Resnick & Henry J. Sommer eds.-in-chief, 15th ed. rev. 2007)); *but see In re Hall*, 376 B.R. at 746 ("[T]he capital gains tax arising from the postpetition sale of the farm land cannot be a tax 'incurred' by the Chapter 12 Estate under § 503(b)(1)(B)(i) because it does not exist as a separate taxable entity. 26 U.S.C. § 1398, 1399. In turn, because the postpetition capital gains tax is not entitled to priority under § 507, it does not fall within the exception carved out by § 1222(a)(2)(A).").

This court's reading of § 1222(a)(2)(A) as applicable to claims arising from post-petition transactions as well as pre-petition transactions is also supported by the available legislative history. *See Florida Power & Light Co.*, 470 U.S. at 737 (when a statute is ambiguous, the court may also seek guidance in the relevant legislative history). Senator Grassley referred to the need to relieve family farmers seeking reorganization from the "crushing tax liability if they need to sell livestock or land in order to reorganize their business affairs" and from the need to pay the IRS in full "for any tax liabilities generated during a bankruptcy reorganization" and to "reduc[e] the priority of taxes during

---

[10]Post-BAPCPA, § 503(b)(1)(B) reads "any tax incurred by the estate, whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both, except a tax of a kind specified in section 507(a)(8)."

[11]The court will consider, below, whether or not a Chapter 12 estate can, indeed, "incur" any taxes.

proceedings." 145 Cong. Rec. S750-02, S764, 1999 WL 20426 (Jan. 20, 1999) (statement of Sen. Grassley on S.260). These comments all make clear that the provision was intended to apply to transactions *during the bankruptcy proceedings*, as well as to transactions that occurred before the filing of a bankruptcy petition. *Accord In re Dawes*, 382 B.R. at 518 (after quoting Senator Grassley's comments, the court observed that "[c]onstruing § 1222(a)(2)(A) to apply to postpetition sales provides debtors and their counsel when formulating a plan the flexibility intended by Congress to make decisions driven by farming and business factors, rather than potential adverse tax consequences."); *but see In re Hall*, 376 B.R. at 747 (finding Senator Grassley's comments are "not the legislative history of BAPCPA, but of legislation introduced in 1999," and finding the sparse legislative history on the BAPCPA "of little assistance in discerning legislative intent").

Moreover, as the bankruptcy court observed in *In re Dawes*, if construed as the IRS desires, § 1222(a)(2)(A) "would not apply to all 'farm debtors,' but only to farmers who had the foresight to liquidate assets before filing." 382 B.R. at 519; *In re Schilke*, 379 B.R. at 903 ("In fact, if [§ 1222(a)(2)(A)] is inapplicable to post-petition taxes as the IRS suggests, the statute becomes meaningless for most debtors as it provides no benefit in a reorganization involving the sale of assets used in a farming operation [but] Chapter 12 expressly contemplates that a plan may provide for the sale of property of the estate. 11 U.S.C. § 1222(b)(8)."). So construed, much of the benefit of § 1222(a)(2)(A) in stripping priority from "claims" of "governmental units," at least to the extent that such "claims" are tax claims, would be "frittered away." *See Wright*, 311 U.S. at 279 (J. Douglas) (observing that "the [Bankruptcy] Act must be liberally construed to give the debtor the full measure of the relief afforded by Congress, lest its benefits be frittered away by narrow formalistic interpretations which disregard the spirit and letter of the Act"). Thus,

any perceived ambiguity about the applicability of § 1222(a)(2)(A) to post-petition transactions means that the statute must be construed in favor of the farmer debtors. *See, ce.g., New Neighborhoods, Inc.*, 886 F.2d at 719 ("Further, ambiguities in the Code are generally resolved in favor of the debtor."). Construing the statute in favor of the farmer debtors, in turn, means that the statute should be construed to afford farmer debtors relief from a broader range of tax claims, including tax claims arising from post-petition transactions, to be consistent with the goal of Chapter 12 "to 'give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land.'" *Justice*, 849 F.2d at 1090 (quoting H.R. Rep. 554, 99th Cong., 2d Sess., 48, reprinted in 1986 U.S. Code Cong. & Admin. News 5249); *accord In re Dawes*, 382 B.R. at 519 (stating, "Construing § 1222(a)(2)(A) to apply to postpetition sales provides debtors and their counsel when formulating a plan the flexibility intended by Congress to make decisions driven by farming and business factors, rather than potential adverse tax consequences," and noting "[t]he entire purpose of Chapter 12 is to allow a farmer to reorganize, and the specific purpose of the amendment to § 1222 was to remove a major impediment to reorganization"); *In re Schilke*, 379 B.R. at 902 (construing § 1222(a)(2)(A) to apply to post-petition transactions "produces the more appropriate result when considering the apparent intent to the statute—that is, to help farmers reorganize").

Therefore, this court affirms the bankruptcy court's conclusion that § 1222(a)(2)(A) applies to post-petition transactions and, hence, to the taxes arising from such transactions.

### b.      *Treatment of post-petition taxes as administrative expenses of the bankruptcy estate*

The IRS also appeals the bankruptcy court's conclusion that a Chapter 12 debtor may treat post-petition income taxes imposed on the debtor's income earned during the pendency of the case as administrative expenses under § 503 and that the plan may propose

payment of such expenses by the estate. *See In re Knudsen*, 356 B.R. at 491. Again, the IRS argues that the post-petition taxes are not "incurred by the estate," so that the post-petition taxes are not pre-BAPCPA administrative expenses and are not an "allowed" expense under pre-BAPCPA § 503. This court disagrees with the IRS and agrees with the bankruptcy court, the Knudsens, and amicus.

This court reaches this conclusion, despite its agreement with the IRS (and the bankruptcy court) that, pursuant to provisions of the Internal Revenue Code, the filing of a Chapter 12 petition does not establish the Chapter 12 estate as a separate taxable entity. *See* 26 U.S.C. §§ 1398(a), 1399, 6012(b)(4). Contrary to the IRS's contentions, however, that is not the end of the matter. Rather, this issue turns on the meaning of terms of the Bankruptcy Code—11 U.S.C. §§ 503, 507, and 1222(a)(2)—and principles of bankruptcy law.

Specifically, § 1222(a)(2) provides, in pertinent part, that "[t]he plan shall . . . provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507. . . ." Thus, the first question is whether the post-petition taxes in question are "claims entitled to priority under section 507," for which the plan shall provide for payment. Section 507, in turn, "sets forth ten categories of claims that are entitled to priority status." *In re Dawes*, 382 B.R. at 513; 11 U.S.C. § 507. As explained above, of those ten categories, only § 507(a)(2) (pre-BAPCPA § 507(a)(1)) identifies tax claims that are potentially post-petition claims, by identifying as priority claims "administrative expenses under section 503(b) of this title." Section 503(b)(1)(B)(i), in turn, in its pre-BAPCPA form, defined "administrative expenses" as including "any tax *incurred by the estate*, except a tax of a kind specified in section 507(a)(8) of this title." (Emphasis added). As the bankruptcy court in *In re Dawes* explained, "Taxes are therefore accorded administrative expenses priority [under § 507] if they are (1) 'incurred

55

by the estate' and (2) not 'of a kind specified in section 507(a)(8).'" 382 B.R. at 514. This court concluded, above, that § 507(a)(8) applies only to pre-petition taxes, so that it is plain that post-petition taxes, which are at issue here, are not "of a kind specified in section 507(a)(8)." Thus, whether post-petition taxes can be paid through the bankruptcy estate turns on whether those taxes are "incurred by the estate." *Id.*

Unfortunately, § 503(b)(1)(B)(i) does not, by its plain language, clarify precisely what "incurred by the estate" means. *See B & D Land & Livestock Co.*, 332 F. Supp. 2d at 1210 (the first approach to statutory interpretation is the "plain language" of the statute in question); *accord In re Hen House Interstate, Inc.*, 177 F.3d at 722 (interpretation of provisions of the Bankruptcy Code begins with the plain meaning of the statute); *In re Martin*, 140 F.3d at 807-08 (same). As the bankruptcy court in *In re Dawes* explained, the question is, does "incurred by the estate" refer to "the time liability for a tax accrues—did the liability arise before or after the creation of the estate under § 541," or does "incurred by the estate," instead, refer to "the entity liable for the tax—is the bankruptcy estate created under § 541 liable for the tax?" 382 B.R. at 515. In other words, the meaning of "incurred by the estate" is ambiguous. *See Florida Power & Light Co.*, 470 U.S. at 736 (a statute is ambiguous if it is capable of more than one reasonable reading); *White Plume*, 447 F.3d at 1074 ("Under statutory interpretation, a statute is ambiguous if it is 'capable of being understood in two or more possible senses or ways.'") (quoting *Chickasaw nation*, 534 U.S. at 90, in turn quoting WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 77 (1985)).

Resolution of such ambiguity may be achieved by examining the legislative history of the statute in question. *See Florida Power & Light Co.*, 470 U.S. at 737 (when a statute is ambiguous, the court may seek guidance, *inter alia*, in the relevant legislative history). The court finds the exhaustive review of the pertinent legislative history of

§ 503(b)(1)(B)(i) in *In re Dawes*, and the conclusions drawn from the legislative history by the court in that case, to be instructive:

> The § 503(b)(1)(B)(i) definition of administrative expense, which applies to all chapters of the Code, was enacted as part of the 1978 Bankruptcy Code. The Senate report accompanying the proposed legislation does not address the identity of the taxpayer as a relevant consideration. It states, when discussing § 503(b)(2):
>
> > In general, administrative expenses include taxes which the trustee *incurs in administering the debtor's estate*, including taxes on capital gains from sales of property by the trustee and taxes on income earned by the estate *during the case*. Interest on tax liabilities and certain tax penalties incurred by the trustee are also included in this first priority.
>
> [S.Rep. No. 95-989, 95th Cong., 2d Sess. 66 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787 (italics supplied), reprinted in D *Collier on Bankruptcy* App. Pt. 4-2008.] The Report of the Recommendations of the Senate Finance Committee, to which the tax-related provisions of the proposed Code had been referred, stated in part as follows concerning tax priorities: "Administrative expenses-Taxes *incurred during the administration of the estate* share the first priority given to administrative expenses generally." [S.Rep. No. 95-1106, 95th Cong., 2d Sess. 13 (1978) (as reported by the Senate Judiciary Committee and the Senate Finance Committee) (italics supplied), reprinted in D *Collier on Bankruptcy* App. Pt. 4-2158.] Hence, the legislative history of § 503(b)(2)(B) evidences that Congress intended "incurred by the estate" to have reference to when the tax liability was incurred, not to the entity having liability for the tax.
>
> This conclusion is strengthened by the history of the enactment of tax provisions related to the 1978 Bankruptcy Code. The phrase "incurred by the estate" in the definition of administrative expenses in § 503(b)(2)(B)(i) was adopted in 1978. Proposals in the 1978 bankruptcy bill concerning

federal taxation were not enacted. [*See Id.*, 7 (stating, "Federal tax rules dealing with the subject matter of this section of title 11 [section 346] will be the subject of legislation expected early in the next Congress."); *see also Towers v. United States (In re Pacific-Atlantic Trading Co.)*, 64 F.3d 1292, 1298-1301 (9th Cir.1995) (when determining that corporate Chapter 11 debtor's tax liability to be an administrative expense, the court examined in detail the legislative history of interaction between the Bankruptcy Code, particularly § 346, and the tax law).] The bankruptcy related tax proposals were enacted as separate legislation, the Bankruptcy Tax Act of 1980. The situation was described as follows:

> Prior to the enactment of the Bankruptcy Tax Act of 1980, there were no specific Internal Revenue Code provisions addressing the federal tax treatment of bankrupt individuals and their corresponding bankruptcy estates. The only guidance was provided by a few rulings issued by the IRS and judicial decisions, which were often conflicting. The legislative history underlying the codification of I.R.C. Section 1398 emphasized the obvious lack of guidance that created uncertainty for taxpayers and the courts.

[*15 Collier on Bankruptcy* ¶ TX2.02[3].] IRC §§ 1398 and 1399, relied upon by the IRS in this case, were enacted as part of that 1980 tax legislation. [Pub.L. 96-589 (1980), reprinted in E-1 *Collier on Bankruptcy* App. Pt. 5(a).] That legislation amended the IRC and addressed matters of tax filing, reporting, and payment obligations, not the definition of administrative claim in the Bankruptcy Code. [See 15 *Collier on Bankruptcy* ¶ ¶ TX3.01, TX 3.02 and TX 3.03.]

Hence, the foregoing legislative history regarding the 1978 Code and the 1980 Bankruptcy Tax Act leads the Court to conclude that the use of the phrase "incurred by the estate" in the definition of administrative expenses in § 503(b)(1)(B)(i) has reference to the time when tax liability is incurred and not to whether the estate is a separate taxable entity.

*In re Dawes*, 382 B.R. at 515-17.

This court agrees with the court in *In re Dawes* that this legislative history makes clear that the phrase "incurred by the estate" in § 503(b)(1)(B)(i) refers to *when tax liability is incurred* rather than to *the existence of the estate as a separate taxable entity*. This court adds that the IRS's contention that § 503(b)(1)(B)(i) must be read in the context of provisions of the Internal Revenue Code, 26 U.S.C. §§ 1398 and 1399 is disingenuous, at best, where § 503(b)(1)(B)(i) was enacted as part of the 1978 Bankruptcy Code, some two years before the passage of the Bankruptcy Tax Act of 1980, in which the two provisions of the Internal Revenue Code on which the IRS relies were enacted. Thus, the meaning of "administrative claim" or "incurred by the estate" in the 1978 provisions simply was not in contemplation of any meaning embodied in provisions later added to the Internal Revenue Code. Moreover, the 1980 enactments did not provide any definition of "administrative claim" in the Bankruptcy Code. *See In re Dawes*, 382 B.R. at 516 (citing 15 COLLIER ON BANKRUPTCY ¶¶ TX 3.01, TX 3.02, and TX 3.03); *but see Hall*, 376 B.R. at 746 (using §§ 1398 and 1399 to conclude that "incurred by the estate" in § 503(b)(1)(B)(i) refers to the entity that incurs the tax).

Furthermore, the bankruptcy court in *In re Schilke* noted that "'incurred by the estate' has been interpreted to simply mean incurred post-petition." 379 B.R. at 902 (citing *L.J. O'Neill Shoe Co.*, 64 F.3d at 1149); *accord In re Dawes*, 382 B.R. at 517 (also noting that "[t]his is the construction given to the phrase by courts and commentators since 1978," citing 4 COLLIER ON BANKRUPTCY ¶ 503.07[1], and *United Mine Workers of Amer.1992 Benefit Plan v. Rushton (In re Sunnyside Coal Co.)*, 146 F.3d 1273 (10th Cir. 1998), the latter as holding that, in a voluntary corporate Chapter 11 case, liability under the Coal Act arising post-petition constituted taxes incurred by the estate). Of the cited

authorities, the critical one for this court is the decision of the Eighth Circuit Court of Appeals in *L.J. O'Neill Shoe*, 64 F.3d at 1149, as Eighth Circuit precedent is controlling on this court.

In *L.J. O'Neill Shoe*, there was no dispute with the bankruptcy court's or the district court's holding that "incurred by the estate" means "incurred postpetition." 64 F.3d at 1149. Moreover, the Eighth Circuit Court of Appeals held that it was not treating the debtor and the estate as two separate entities in a Chapter 11 corporate case, in violation of 11 U.S.C. § 346(c) and 26 U.S.C. § 1399, which "dictat[e] that the bankruptcy estate of the corporate debtor [in a Chapter 11 case] is not a separate taxable entity." *Id*. at 1151 & n.7. Rather, the court held that it was allowing the Missouri Department of Revenue to tax the debtor and the estate as one continuous corporate entity, but allocating part of the tax as a claim against the estate. *Id*. at 1152. The court observed,

> As is quite common in bankruptcy claims adjudication, one portion of the claim is being treated as an administrative expense for distribution purposes, and the other portion is being treated as a priority claim entitled to a seventh priority for distribution purposes. Simply stated, the tax is being imposed against the single corporate entity in keeping with section 346(c)(1), but the payment of the tax imposed is being divided into separate components in accordance with the bankruptcy laws determining the priority of payment of those claims. Thus, there is nothing in either the bankruptcy or tax laws which prevents us from allowing different treatment during distribution for different portions of MDOR's claims in this case.

*L.J. O'Neill Shoe Co.*, 64 F.3d at 1152. Likewise, here, there is nothing that prevents the court from allowing different treatment of different portions of the IRS's tax claim, such as the portion arising from the post-petition sale of farm assets, on the one hand, which may be paid as administrative expenses of the estate pursuant to § 1222(a)(2) (and which

are subject to priority-stripping and discharge), and other portions of the IRS's tax claims, on the other, even if the estate is not a separate taxable entity. To put it another way, allowing taxes subject to § 1222(a)(2)(A) to be paid as administrative expenses of the estate is simply allowing the IRS to tax the debtor and the estate as one continuous corporate entity, but allocating part of the tax as a claim against the estate. *Id.* at 1152.

Moreover, *L.J. O'Neill Shoe* is not distinguishable from this case, as the IRS contends, because it was a Chapter 11 case, but this is Chapter 12 case in which there is no separate taxable entity. As the court observed in *L.J. O'Neill Shoe*, in a Chapter 11 corporate case, there is also no separate taxable estate. *See id.* at 1151 & n.7 (11 U.S.C. § 346(c) and 26 U.S.C. § 1399 "dictat[e] that the bankruptcy estate of the corporate debtor [in a Chapter 11 case] is not a separate taxable entity"). Thus, despite a difference in applicable chapters of the Bankruptcy Code, *L.J. O'Neill Shoe* did consider the treatment of post-petition taxes in a comparable circumstance with regard to whether or not the bankruptcy estate was a separate taxable entity. This court also does not find that *L.J. O'Neill Shoe* can be construed to limit its holding that the payment of the tax imposed may be divided into separate components in accordance with the bankruptcy laws determining the priority of payment of those claims, *id.* at 1152, in such a way that it is inapplicable to division into separate *post-petition* components, as the IRS contends. Nor is the court persuaded by the IRS's contention that amendments to 11 U.S.C. § 507 in the BAPCPA abrogated the ruling in *L.J. O'Neill Shoe*, because the amendments prohibit bifurcation of income in bankruptcy cases, so that no part of the taxes from the year of the petition can be claimed as priority claims for unassessed taxes. As the bankruptcy court in *In re Dawes* pointed out, the amendment to § 507 after the *L.J. O'Neill Shoe* decision had to do with eighth priority (*i.e.*, pre-petition tax) claims, a matter not at issue in this case. 382 B.R. at 520.

Finally, the court is not persuaded by the IRS's contention that assets and earnings of the debtor post-petition become property of the estate, and the bankruptcy court's ruling would require that all income taxes attributable to these assets and earnings would also be treated as expenses incurred by the estate, creating complications in calculations upon plan confirmation when some property revests with the debtors, supposedly resulting in some fraction of income tax being incurred by the estate, but with the remainder being attributable to the debtor. As the bankruptcy court below noted, although confirmation of the plan may, under 11 U.S.C. § 1227(b), vest "all of the property of the estate in the debtor," that does not mean that the estate ceases to exist, although it may give the debtor control of the property, because the estate may continue to hold property that is necessary for the effectuation of the plan, and the debtors may sell the estate property in the performance of the plan. *In re Knudsen*, 356 B.R. at 490 (quoting § 1227(b) and citing *Security Bank of Marshalltown, Iowa v. Neiman*, 1 F.3d 687, 691 (8th Cir. 1993)). This court observed, above, that the plain language of § 503(b)(1)(B)(i) requires that the bankruptcy estate must "exist," or it could not otherwise "incur" any tax liability, but this court now adds that this requirement does not mean that the bankruptcy estate must exist as a separate taxable entity. Because the estate continues to exist, even after confirmation of the plan, it may still "incur" the taxes on post-petition transactions pursuant to § 503(b)(1)(B)(i), where, as explained above, "incurred by the estate" means "incurred post-petition."

Therefore, this court affirms the bankruptcy court's conclusion that a Chapter 12 debtor may treat post-petition income taxes imposed on the debtor's income earned during the pendency of the case as administrative expenses under § 503 and that the plan may propose payment of such expenses by the estate.

### III. CONCLUSION

Upon review of the bankruptcy court's November 20, 2006, Decision Re Plan Confirmation (docket no. 1-37), this court, in essence, affirms the challenged parts of the bankruptcy court's decision in which the bankruptcy court properly construed pertinent provisions of the Bankruptcy Code consistent with bankruptcy policy, but reverses the challenged parts of the bankruptcy court's decision in which the bankruptcy court, instead, construed provisions of the Bankruptcy Code consistent with the Internal Revenue Code in derogation of bankruptcy policy. The bankruptcy court's fundamental error, this court finds, was accepting the IRS's characterization of the pertinent provisions as federal income tax provisions found in the Bankruptcy Code, when they are properly understood as bankruptcy provisions to be construed in accordance with the Bankruptcy Code and bankruptcy policy to promote the effective reorganization of family farming operations.

THEREFORE, the bankruptcy court's November 20, 2006, Decision Re Plan Confirmation (docket no. 1-37) is **affirmed in part and reversed in part**. More specifically,

1.      The Knudsens' pre-petition sale of slaughter hogs in 2004 is entitled to the benefit provided by 11 U.S.C. § 1222(a)(2)(A), and that part of the bankruptcy court's decision holding to the contrary is **reversed**;

2.      The "marginal method" is the correct method to determine the allocation of taxes between priority and non-priority claims, and that part of the bankruptcy court's decision holding to the contrary and adopting the "proration method" is **reversed**;

3.      A Chapter 12 debtor may treat post-petition income taxes imposed on the debtor's income earned during the pendency of the case as administrative expenses under § 503 and plan may propose payment of such expenses by the estate, and that part of the bankruptcy court's decision so holding is **affirmed**.

This matter is **remanded** with instructions to confirm the Knudsens' Fifth Amended and Substituted Plan of Reorganization.

**IT IS SO ORDERED.**

**DATED** this 12th day of June, 2008.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA